**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED

2003 OCT 31 P 3: 25

US DISTRICT COURT
BRIDGEPORT CT

| | | |
|---|---|---|
| ROBERT KALMAN, | : | PRISONER |
| Plaintiff, | | |
| V. | : | Civil Action No. 3: 03cv 671 |
| | | (DJS) (TPS) |
| ROBERT BERGER, et al., | : | |
| Defendants, | | October 29, 2003 |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**SUMMARY JUDGEMENT**

**STATEMENT OF THE CASE**

This civil action involves no claim for monetary damages of any kind or for recovery of property. This action was brought to this Honorable Court as a Declaratory Judgement filed under the American with Disabilities Act, Title II, 28 C.F.R., Sec., 35.172, the Federal Declaratory Judgements Act, 28 U.S.C., Sec., 2201, and pursuant the Civil Rights Act, 42 U.S.C., Sec., 1983.

The pro se, plaintiff is a resident of the Connecticut Valley Hospital and he is confined under the most restrictive setting, in the maximum-security division at Whiting Forensic Institute. Plaintiff in this motion seeks summary judgement for the denial of Due Process of Law

**ORAL ARGUMENT REQUESTED**

1

## STATEMENT OF THE FACTS

As set fourth in the accompanying declaration the plaintiff, following a trial before a jury of six, the jury found the plaintiff not criminally responsible by reason of mental disease or defect. Defendants Robert Berger, John Ryan, Janet Williams, Sylvia Cancela and Susan Blair, after an Initial Commitment Hearing, held pursuant Conn. Gen. Stat. Sec., 17a-583 ordered the plaintiff confined under the most restrictive conditions at Whiting Forensic Institute.

Conn. Gen. Stat. Sec., 17a-583, mandates the defendants to "(a) conduct a hearing to review the status of the acquittee within ninety days of an order committing an acquittee to the jurisdiction of the board.... (b) At any hearing held pursuant to this section, the board shall make a **finding** and act pursuant to section 17a-584." Section 17a-584 provides in pertinent part that "[a]t any hearing before the board considering the discharge, conditional release or confinement of the acquittee,...., the board **shall make a finding as to the mental condition of the acquittee** and considering that its primary concern is the protection of society, shall do one of the following:" either (1) discharge the acquittee; (2) conditionally release the acquittee: or (3) confine the acquittee "in a hospital for psychiatric disabilities." "[a]t any time the court or the **board** determines that the acquittee is a person who should be

confined, **it shall make a further determination of whether the acquittee is so violent as to require confinement under conditions of maximum security..**" Conn. Gen. Stat. Sec., 17a-599, in pertinent part.

On January 10, 2003, the defendants held the Initial Commitment Hearing pursuant to Sec., 17a-583, where two medical experts testified and concluded that plaintiff could be placed productively and appropriately in a less restrictive and more integrative setting.

On February 21, 2003, defendants issued a Memorandum of Decision ordering the plaintiff confined within a maximum-security setting.

The Memorandum of Decision issued by defendants on February 21st, 2003 states that Robert Kalman **"is so violent that he requires confinement within a maximum-security setting."** The finding and order was clearly erroneous in view of the reliable, probative and substantive evidence on the record, and thereby depriving the plaintiff of the due process of law. Plaintiff is denied the benefits of services, activities, opportunities, advantages, and rights enjoyed by others in the least restrictive setting. The extent to which the defendants have construed "so violent as to require confinement under conditions of maximum security" to include the plaintiff within the class of individuals to which it applies violates Amendment Fourteenth of the United States Constitution.

## ARGUMENT

## POINT I

## CONNECTICUT GENERAL STATUTES SECTION 17a-599 CREATES A LIBERTY INTREST PROTECTED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND THE DEFENDANTS DECISION IS, UNSUPORTED BY ANY EVIDENCE, DENIED DUE PROCESS OF LAW.

On January 10th, 2003, Dr. Alexander Carre, M.D. testified that the plaintiff has been "an exemplary patient" from his initial commitment throug the time Whiting submitted its report on March 15, 2002. Dr. Carre' was quoting from the report submitted to the Superior Court pursuant to Conn. Gen. Stat. Sec., 17a-582, and this report reflects that the Diagnostic team from Whiting Forensic determined that plaintiff is an acquittee with primary diagnosis relating to substance dependence. Attached to this Brief is the diagnostic team's report page # 13, reflecting the diagnostic teams finding. See Exhibit #1. Under Axis II, it is reflected that the diagnostic team and Dr. Carre had found a "**V 71.01** Adult Antisocial Personality Disorder". The **DSM-IV-TR**, American Psychiatric Association's Diagnostic and Statistical Manual states that:  "**V71.01 Adult Antisocial Behavior**

> This category can be used when the focus of clinical attention is adult antisocial behavior that is not due to a mental disorder (e.g., Conduct Disorder, Antisocial Personality Disorder, or an Impulse-Control Disorder). Examples include the behavior of some professional thieves, racketeers, or dealers in illegal substances." P# 310

4

The United States Supreme Court has long recognized that commitment to a mental hospital produces "a massive curtailment of liberty." See **Humphrey v. Cady**, 405 U.S. 504,509 (1972). In the context of a prisoner being transferred from a prison to a mental hospital, the Court unequivocally stated "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital can engender adverse social consequences to the individual and that [w]hether we label this phenomena stigma or choose to call it something else .... We recognize that it can occur and that it can have a very significant impact on the individual." See **Vitek v. Jones**, 445 U.S.480, 100 S. Ct. 1254,1263 (1980). In addition, plaintiff has the right to be placed in the least restrictive setting. Individuals acquitted and/or not held criminally responsible by reason of mental defect have no Constitutional right to be placed in the least restrictive environment. See **Kulak v. Berkelhammer**, 88F. 3d 63, 73(2dCir1996). "However, a state may create such a liberty interest protected under the Fourteenth Amendment by regulations, statutes, or court orders 'mandatory in character.'" **Id**. A statute may give rise to a liberty interest to due process protections based on the use of mandatory language coupled with "substantive predicates"; raising a presumption that a designated right or privilege will be granted when the designated findings

are made. See **Vincenzo v. Warden**, 26 Conn. App. 132, 138-40, 599 A. 2d31(1991), citing **Greenholtz v. Nebraska Penal Inmates**, 44 U.S. 1 (1979), and **Board of Pardons v. Allen**, 482U.S.369 (1987). See also **Sandi v. Conner**, 515 U.S. 472,479 (1995)("[t]he word 'shall' in the statute created a legitimate expectation") A liberty interest protected by the Due Process Clause of the Fourteenth Amendment may arise out state law. **Vitek v. Jones**, 445 U.S. 480, 488-90 (1980).

Conn. Gen. Stat. Sec., 17a-599 is mandatory as the statute includes the word "shall" in its directive. Once the court or the board determines that an acquittee is a person, who should be confined, a further determination "shall" be made as to "whether the acquittee is so violent as to require commitment under conditions of maximum-security." Sec., 17a-599 contains both the required mandatory language and substantive predicate. As this statute is mandatory, it creates a right, protected liberty interest of the plaintiff, to be free of maximum-security confinement. As such, a denial of this right is a Constitutional depravation.

Underlying the plaintiff's claims in this civil action, there was undisputed testimony provided by Dr. Alexandre Carre' M.D., the plaintiff's attending psychiatrist from 10/ 30/01 to 8/2/02, who testified, ***inter alia***, "We have not found **any significant evidence of a mental disorder**. We simply

established the diagnosis of substance use disorder compounded with a personality disorder that put him at risk of offending in the community." See Hearing Transcript 1/10/03, p. # 7 at 18.

Dr. Sabita Rathi, M.D., the plaintiff's attending psychiatrist at the time of the hearing, (1/10/03) testified, **_inter alia_**, "Mr. Kalman was transferred from Unit 2 to Unit 4 on 10/15/02. To date, Mr. Kalman has not been a management or behavior problem on the unit. He has adjusted well to the unit. He has not been in any physical or verbal altercations with any staff or patients. He has been attending therapeutic and rehabilitation groups. He has, however, continued to be very focused on legal issues. He spends most of his time when not in groups, writing about legal issues." <u>See,</u> Transcript. P. # 8 at 9 to 17, (1/10/03)

Dr. Rathi further testified, **"On mental status exam, he's alert, oriented, cooperative. He shows no signs of psychomotor agitation. His mood is euthemic. His effect is full range. His thought processes are logical and goal directed. There's no indication of suicidal or homicidal ideation. There's no perceptual disturbances and no indication of other psychotic symptoms, including paranoia and delusions."** 1/10/03, Transcript p. # 9 at 9 to 16.  At an Initial Commitment Hearing pursuant to Conn. Gen. Stat. Sec., 17a-583 the defendants must make a finding to the mental condition of

the plaintiff determining the severity of a psychiatric disability. Sec. 17a-583 mandates that "At any hearing held pursuant to this section, the board shall make a **finding** and act pursuant to section 17a-584." Sec., 17a-584 provides in pertinent part that "[a]t any hearing before the board considering the discharge, conditional release or **confinement** of the acquittee, ...., the **board shall make a finding as to the <u>mental condition</u> of the acquittee** and considering that its primary concern is the protection of society, shall do one of the following:" either (1) discharge the acquittee; (2) conditional release the acquittee; (3)confine the acquittee "in a hospital for psychiatric disabilities." Sec., 17a-599, provides in pertinent part that "[a]t any time the ....board determines that the acquittee is a person who should be confined, it shall make a **further determination of whether the acquittee is so violent as to require confinement under conditions of maximum security...**"

Other states have found that a person is entitled to be confined to the least restrictive setting either through statutes or common law. The District of Columbia recognizes that "one who by reason of insanity is acquitted of a crime and ...is committed to a mental hospital is entitled not only to treatment, but to treatment in the least restrictive alternative consistent with the legitimate purposes of a commitment." **<u>Jackson v. United States</u>**, 641A2d 454, 457(D.C.,1994) "The level of confinement is ...relevant to the

8

inquiry that the [court] has to make when an acquittee seeks a change in the manner of his confinement." **Reese v. United States**, 614 A. 2d 506, 511 (1992). The "least restrictive language" means "that the treatment must be the best treatment for the acquittee that protects the public safety." Id.(emphasis added).   Illinois has codified a right to the least restrictive setting in Section 2-102(a) of the Mental Health Code which states that "[a] recipient of services shall be provided with adequate and humane care and services in the least restrictive environment." 405ILCS. 4/2-102 (a)(2002). A 111 "The mere fact that plaintiffs have been involuntarily committed as NGRI acquittees does not deprive them of substantive liberty interests under the fourteenth amendment." **C.J. v. Dept. of Mental Health and Developmental Disabilities**, 296 III. App. 3d 17,27,693 N.E. 2d 1209, 1215 (1998)(citing **Vitek v. Jones**, 445 U.S. 480, 491 (1979)). "Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental actions." C.J., 693 N.E.2d at 1215 (quoting **Greenhotz v. Inmates of Nebraska Penal & Correctional Complex**, 442 U.S. 1, 18 (1979))(Powell, J., concurring in part and dissenting in part)).

The Connecticut and the United States Constitutions mandate that a person shall not be deprived of life, liberty or property without due process of law. "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' **Adingtom v. Texas**, 441 U.S. 418, 425, 99 S. Ct. 1804, 1810,60 L.Ed.2d 323,332 (1979). Due Process requires the State to establish, by clear and convincing evidence, that the individual is both mentally ill and dangerous to justify involuntary civil commitment. Id., 426-27. (**Adington** standard). The defendants must have "a constitutionally adequate purpose for the confinement." **O'Connor v. Donaldson**, 422 U.S. 563,574, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975).

Moreover, "[I]n **Foucha v. Louisiana**, the Supreme Court recognized that freedom from bodily restraint is a liberty interest that applies to insanity acquittees. **Foucha v. Louisiana**, 504 U.S. 71,80 (1992)." 693 **C.J., N.E.** 2d at 1216. Even when acquittees are found to be in need of a secure placement, the "secure setting is in effect the least restrictive environment permitted for NGRI acquittees under the law..." **C.J.,** 693 N.E. 2d at 1213.

In New York, in the case of insanity acquittees, the legislature has outlined procedures for insuring that people committed are not in a secure facility when they can be safely treated in a less restrictive environment. **People v.**

**Betances**, 176 Misc. 2d 66, 71, 671 N.Y.S. 2d 930 (1998). "There is no logical reason to believe that, in prescribing care and treatment at an appropriate institution, the Legislature intended harsher treatment for a patient who is merely accused of a nonviolent criminal act, but not proven to have committed any crime at all, than one found not responsible by reason of mental disease or defect." **Id.**

The level of restraint does not need to be so high as to "eliminate that risk altogether." In re **J.L.J., 196 N.J. Super**. At 47, 481 A. 2d at 570. In addition to protecting the state-created liberty interest, commitment of an insanity acquittee confers additional responsibilities on the state to minimize restrictions. "Because the State necessarily retains substantial control over the individual's life and liberty in the process of arranging for appropriate placement, the individual's right must be protected by procedures designed to minimize restrictions on that liberty." In re **J.L.J. 196 N.J. Super**. At 46, 481 A. 2d at 569. Commitment must "responsibly minimize [] infringements upon defendants liberty and autonomy and give [] him the best opportunity to receive appropriate care and treatment." **Krol**. 68 N.J. at 257-58, 344 A. 2d at 300-01.

In the present case before the bar, if the defendants determine under subsection (3) of the Conn. Gen. Stat. Sec., 17a-584 that the plaintiff is an

acquittee with psychiatric disabilities who should be confined, the defendants then must go on to determine whether under Section 17a-599, the plaintiff is so violent that he should be confined under conditions of maximum security. There was undisputed testimony by Dr. Carre' while he was cross-examined by plaintiffs' defense counsel that the plaintiff has no significant psychiatric disability and he is not violent. "**No, I - - I** had made it clear that Mr. Kalman **has never been violent** on the unit." H/T p #11 at 2.

The defendant's issued a Memorandum of decision dated February 21, 2003, finding that Robert Kalman "is **so violent** that he requires confinement within a maximum-security setting." See Exhibit # 2. The defendants denied the plaintiff the due process of law, they ordered plaintiff confined to a maximum-security facility. The plaintiff has been non-violent during his entire stay at Whiting and fully cooperative. Plaintiff had filed grievances on his own behalf and at the request of his peers. Furthermore, plaintiff also per request of others similarly situated, acted as a peer advocate as provided by this Honorable Court's order in the case of **William Roe, et al., v. Michael Hogan, et al**, AGREEMENT OF SETTLEMENT, Civil No. H89-570 (PCD). In addition plaintiff per request of others similarly situated is officially appointed through Specific and Limited Power of Attorney as their peer advocate. This is the behavior that Dr. Carre' regards "inappropriate" and/or

"He began to engage the treatment team in a one upmanship" Transcript p # 6 at 2 to 21. Plaintiff had filed pursuant to State and Federal Regulations' reports describing abuse of residents. The plaintiff also assisted others with civil litigation when others requested it. Abuse of residents is common in this facility and there are numerous Federal Investigation Reports supporting this claim. Plaintiff was in conflict with Dr. Carre due to Dr. Carre's repeated denial of the plaintiff's right to access his medical/clinical records. In addition Dr. Carre' refused to allow plaintiff to participate in developing his treatment plan as proscribed by the above cited **AGREEMENT OF SETTLEMENT**. Dr. Carre also refused to allow plaintiff to have the DMHAS, Client Rights Officer present during meetings. Plaintiff filed grievances against Dr. Carre in accordance with DMHAS, Commissioner Grievance Policy (CRIPA). Treatment services must be consumer friendly, geared to give consumers real and meaningful opportunity to participate in developing treatment plans and treatment options. Services should not be oriented to the requirements of bureaucracies. However, plaintiff's ability to assert his rights is not a behavior to provide the basis for maximum-security confinement under the controlling standard. For the plaintiff, recovery is the ability to live a fulfilling and productive life despite a disability. For others, disability may refer to stigma, to a cluster of negative attitudes and rejection.

**ARGUMENT**

**POINT II**

**THE EVIDENCE UNEQUIVOCABLLY DEMONSTRATES THAT KALMAN IS NOT "SO VIOLENT" AS TO JUSTIFY THE MASSIVE CURTAILMENT OF LIBERTY PRODUCED BY COMMITMENT UNDER MAXIMUM-SECURITY CONDITIONS AND PLAINTIFF WAS DEPRIVED OF DUE PROCESS OF LAW**

"As a general matter, the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous....As he was not convicted, he may not be punished. His confinement rests on his continued illness and dangerousness. **Jones v. United States**, 463 U.S. 354, 368-69, 102 S. Ct. 3043, 77 L.Ed. 2d 694 (1983)."(Internal quotation omitted.) **Payne v. Fairfield Hills Hospital**, 215 Conn. 675, 683-84, 578 A. 2d 1025 (1990). Thus, unlike a defendant who has been convicted of a crime, a defendant who has been found not guilty by reason of lack of capacity due to mental disease or defect is not criminally responsible for his or her unlawful conduct and, consequently,

certain important goals of sentencing, including punishment and deterrence, are inapplicable."

The final phase of evidence concerning the expert testimony that addressed the issue of whether plaintiff's primary diagnoses derives from substance and alcohol dependence, which are excluded, as a psychiatric disability under the PSRB. The only disorder relied upon by defendant's that is unrelated to plaintiff's substance/alcohol dependence is the Adult Antisocial Personality Disorder provided by Dr. Carre' and the Whiting diagnostic treatment team. The plaintiff submits that this condition is neither a disorder nor a psychiatric disability justifying the extreme deprivation of liberty inherent in involuntary commitment and confinement under conditions of maximum-security. <u>See</u> **State v. Wooster**, supra, 208-210. Regarding the differences between Antisocial Personality Disorder and Adult Antisocial Behavior, the DSM-IV, upon which Dr. Carre and the Whiting Forensic Diagnostic Team relied in reaching this diagnosis, states:

"Antisocial personality Disorder must be distinguished from criminal behavior undertaken for gain that is not accompanied by the personality features characteristic of this disorder. Adult Antisocial Behavior ... can be used to describe criminal, aggressive or other antisocial behavior that comes to clinical attention but that does not meet the full criteria for Antisocial Personality Disorder. Only when antisocial personality treats are inflexible, maladaptive, and persistent and cause significant functional impairment or subjective distress do they constitute Antisocial Personality Disorder." DSM –IV, 649 (Emphasis added).

The DSM-IV also provides:"[t]he essential feature of Antisocial Personality Disorder is a pervasive pattern of this regard for, and violation of the rights of others that begins in childhood or early adolescence and continues into adulthood." (Emphasis added.) DSM-IV, p.649. There was undisputed testimony provided by Dr. Carre' that "In assessing his risks, the **most significant** factor for Mr. Kalman was his diagnosis of alcohol dependence and cocaine dependence in light of his inability to remain substance free…which magnify the risk of re-engaging in substance use and behaving in a way that would offend or break the law. We have not found **any significant evidence of a mental disorder**. We **simply established** the diagnosis of substance use disorder compounded with a personality disorder that **put him at risk of offending in the community**." 1/10/03 Transcript p. # 7 at 7 to 22.

Dr. Carre' further testified that the plaintiff's diagnoses of substance dependence in remission and personality disorder, were not disorders qualified as a defense to criminal conduct pursuant to Conn. Gen. Stat. Sec., 53a-13. 1/10/01 Transcript p. # 12 at 10 to 14.

Dr. Carre' specifically stated under cross-examination that "No, I - -I have not." Dr. Carre' and the Diagnostic Team has not been able to diagnose the plaintiff with any disorder that qualifies as a defense to criminal conduct.

Where one cannot be found not guilty by reason of mental disease or defect if the disease or defect is proximately caused by the voluntary ingestion of drugs or alcohol, it is unreasonable that he could be committed and confined to a maximum-security psychiatric facility on that basis following an insanity acquittal. Defendants violated substantive due process under the state and federal Constitutions because a finding of dangerousness alone is an inadequate basis upon which to impose the extreme depravation of liberty resulting from commitment, in a maximum-security mental institution under the most restrictive conditions. Due Process prohibits a state from confining an individual unless he is both "mentally ill and dangerous." **Foucha**, supra, 80. Accordingly, plaintiff's confinement in maximum-security mental institution violets Due Process because dangerousness absent mental illness does not provide a constitutional basis for commitment and confinement.

The plaintiff claims that Conn. Gen. Stat. Sec., 17a-599 authorizes defendant's to order the plaintiff confined in maximum-security only upon a "finding" that plaintiff is an acquittee disabled from a psychiatric disability that would cause him to be "so violent as to require confinement under maximum-security conditions..."

In the case of **Dyous v. PSRB**. 264 Conn. 766, 826 A. 2d 138 (2003) the case concerned an administrative appeal to the Superior Court from a PSRB

order transferring Dyous, an acquittee, who had been committed five years earlier, to maximum-security commitment after continuing acquttee's confinement during a periodical two year status review hearing pursuant to Conn. Gen. Stat. Sec, 17a-585, that mandates the PSRB to conduct a hearing to review the status of an acquittee not less than once very two years.**Dyous v. Psychiatric Sec. Review Bd.** 264 Conn. 766 A. 2d 138 (2003) does not control the present matter before this Honorable Court. In Dyous the Connecticut Supreme Court affirmed the Superior Court's granting of the state's motion to dismiss on the grounds that the PSRB transfer order was not appealable and thus the Superior Court lacked subject mater jurisdiction. The court held "that there is no administrative appeal from the decision of the PSRB transferring the plaintiff to a maximum-security facility." **Id.**, 775. Additionally, **Dyous,** is not controlling because this case does not concern administrative appeal from a transfer order nor a review hearing pursuant to Conn. Gen. Stat. Sec., 17a-585 (two year mandatory review hearing). This civil action derives from an Initial Commitment Hearing pursuant to Conn. Gen. Stat. Sec., 17a-583 where a final decision had to be made by the defendants. Further, administrative appeals from the PSRB decisions are governed by Section 17a-597. In sum, **Dyous,** concerned administrative appeal from a transfer order and jurisdiction.

Plaintiff claims that pursuant to Conn. Gen. Stat. Sec., 17a583 and 17a-584 where the defendants order confinement it must, at the same time, determine if maximum-security confinement is warranted. The Legislature intended for PSRB to order an acquittee confined under conditions of maximum-security only where the PSRB, after having already concluded that the acquittee is "a person who should be confined," is "so violent" that confinement under maximum-security conditions is warranted for the safety and protection of other patients and for safety of hospital staff. Pursuant to Conn. Gen. Stat. Sec., 17a-584 the defendants after considering the protection of society as their primary interest, has to determine if plaintiff is disabled to the extent that he presents a substantial risk of inflicting physical harm upon himself or on another person. Compare Conn. Gen. Stat. Sec., 17a-599 to Connecticut State Agencies Regulation section 17a-581-56 (a) (permitting transfer to maximum-security, absent court or PSRB order when **"the continued presence of the acquittee in a maximum security setting poses an immediate threat to the safety or wellbeing of any person."**) It is for this reason that "[a]ny acquittee found so violent as to require confinement under conditions of maximum security shall not be confined in any hospital for psychiatric disabilities or placed with the commissioner of Mental Retardation unless such hospital or said  commissioner has the trained and

equipped staff, facilities or security to accommodate such acquittee." C.G.S. Sec., 17a-599. If the legislature desired to provide the Court or the PSRB with the discretionary authority to order an acquittee who is not "so violent" confined under conditions of maximum-security for reasons other than that the acquittee is "so violent" as to require confinement under conditions of maximum security then it would have done so. Compare Conn. Gen. Stat. Sec., 17a-599 to Connecticut Regulation Section 17a-581-44.

**"Confinement in maximum security."**

"The Board may order a person **confined in a maximum security setting** if the Board **finds that the acquittee poses a danger to self or others such that a maximum security setting is required.**" (Effective May 21, 1992).

Also compare Sec., 17a-583 (a) At any hearing held pursuant to this section, the board shall **make a finding** and act pursuant to section 17a-584" Conn. Gen. Stat. Sec., 17a-584 provides in pertinent part "[a]t any hearing before the board considering the ..... **confinement** of the acquittee,..., the board shall make a finding **as to [the mental conditions] of the acquittee**..." "[a]t any time ...., the board determines that the acquittee is a person who should be **confined**, it shall **make a further determination** of whether the acquittee is **[so] violent** as **to require confinement** under conditions of maximum security..."Sec., 17a-599.

It is established that "[t]he `confinement of all acquittees under Section [17a-580 to 17a-602]. Is based on dangerousness..." (Emphasis in original) **Franklin v. Berger**, 211 Conn. 591, 604, 560 A. 2d 444 (1989). In addressing the standard of dangerousness under Section 53a-47, the Connecticut Supream Court stated: "[d]anger should not be confused with violence. The concept of dangerous activity could be deemed to nonviolent behavior." **State v. Laferty**, 192 Conn. 571, 575 (1984).

Violent is not defined in the PSRB statutory scheme. Pursuant to Conn. Gen. Stat. Sec., 1-1 (a) "words and phrases shall be construed according to the commonly approved usage of the language..." according to Marriam-Webster's Collegiate Dictionary (10th Ed. 1999), 'danger' means 'exposure or liability to injury, pain, harm or loss...' 'Dangerous' means 'able or likely to inflict injury or harm.'" **State v. Jacob**, 69 Conn. App. 666, 685, 798 A. 2d 974 (2002). On the other hand, "violent" means "[n]otably furious or vehement;...extreme, intense...; emotionally agitated to the point of loss of self-control; prone to commit acts of violence." Webster's Dictionary, supra, 1038. The comparative meanings of violent, danger and dangerous show that an individual who is "so violent," as opposed to dangerous, is more explosive, more likely to commit acts of violence while having diminished control over such explosive conduct. Further, under Sec., 17a-

599, violent is modified by "**so**," which means "to a greater extent or degree: very, extremely…: to a definite but unspecified extent or degree." Webster's Dictionary, supra, 985. Thus, pursuant to the statutory language setting forth the standard for maximum-security confinement, the defendants must find or conclude that the plaintiff is very or extremely violent, and thus violent to the extent requiring the extraordinary measure of confinement under maximum-security conditions. This standard also comports with the Connecticut Supreme Court's recognition "that the loss of liberty is all the more profound when the institution to which the patient **has been committed is a maximum security facility such as Whiting**." **Connelly v. Comm'r of Correction**, 258 Conn. 394, 405-406, 780 A. 2d 903 (2001). The PSRB commitment scheme is based upon the extent of the acquittee's dangerousness and mental condition as to psychiatric disability. Thus confinement under maximum-security conditions is not for purposes of protecting the public. Rather, that interest has already been addressed in the order of confinement. Moreover, since the plaintiff's confinement at hospital for mental illnesses is for "care custody and treatment," those interests are also served. Confinement under maximum-security conditions is for the safety of the staff, other patients and the acquittee. See **Dyous**, supra, 777; see also Regs. State Agencies Section 17a-581-56(a) (permitting transfer to

maximum security, absent a court or PSRB order when "the continued presence of the acquittee in a non maximum security setting poses an immediate threat to the safety or well-being of any person."). On January 10, 2003, Dr. Carre testified that: "Well, I don't think Whiting is the only place that could take care of Mr. Kalman's needs." Transcript p.# 22 at 1 to 3.

A report written by Dr. Peter Zeman, a psychiatrist who conducted an independent evaluation of the plaintiff for the defense dated July 18, 2002, quoted from by the defendant Robert B. Berger, the Chairman of the PSRB while questioning Dr. Carre.


Chairman Berger quoting the report of Dr. Zeman, M.D., Senior Consultant, The Institute of Living:

"Although Mr. Kalman does not present a danger to himself or others within a structured hospital setting, it is very likely were he to be in the community at this time, that he would resume his abuse of alcohol and cocaine and would rapidly become dependant upon both of these substances. Upon the resumption of alcohol and cocaine use, it is probable that Mr. Kalman would present a danger to himself and others." Transcript p. 23 at 5 to 13.

Chairman Berger asked the question: "At the present time do you feel that Mr. Kalman needs to be in Whiting considering the statement of Dr. Zeman?" Dr. Carre: "I believe that Mr. Kalman needs to be an inpatient. Does he need the maximum security at Whiting, I doubt it...." P. 24 at 2-8

23

Further, Dr. Rathi, testified that although it is generally the practice to observe a patient for approximately six months before recommending a transfer to a less restrictive setting, if she had to make the decision the day she testified, she would agree; "Yes, he would be good candidate for Dutcher, correct." 1/10/03, Transcript p. # 25 at 21 to 22.

The evidence unequivocally demonstrates that the plaintiff at the time of the hearing on January 10, 2003 did not have a psychiatric disability to the extent that he would present an imminent danger to the safety or to the well--being of any other person. The evidence presented and all the clinical records demonstrate that plaintiff can be managed effectively and productively in the least restrictive setting. Dr. Carre' testified before the defendants that he and the Diagnostic Team from Whiting did not find any significant evidence of a mental disorder and plaintiff's mental status continued to remain stable even after a rather long period of not being on any psychotropic medication. Dr. Carre made it clear that plaintiff was never violent on the unit and he and the diagnostic team could not diagnose plaintiff with any mental disorder or illness that qualifies as a defense to criminal conduct. Dr. Rathi emphasized that plaintiff's mental condition is intact and she concurred with Dr. Carre and with the Diagnostic Team's findings. Dr. Rathi agreed that plaintiff is a good candidate for a least

restrictive setting. The report of Dr. Zeman, quoted by defendant Berger, stated that upon the resumption of substances and alcohol it is probable that the plaintiff may present a danger. In the contest of a prisoner being transferred to a mental institution, since mental institutions are not within the terms of confinement included in the penal system certain procedural safeguards must be followed before a prisoner can be subjected to involuntary psychiatric treatment and confinement in a mental institution. In many states three medical officers must examine the inmate alleged to be insane or of unsound mind. In federal cases, the warden or superintendent of the institution, the Attorney General, and Surgeon General of the United States Public Health Service all appoint one expert in mental diseases. Once treatment is deemed no longer necessary, the prisoner must be returned to the state's corrections. If the maximum time of sentence expires while still in the mental institution, the prisoner must be released. Civil commitment proceedings must be begun if the state whishes to keep the person confined to a psychiatric hospital. See, generally **Vitek v. Jones**, and **Matthews v. Hardy**, 420 F. 2d 607 (D.C. Cir. 1969), Cert. Denied 397 U.S. 1010 (1970). The plaintiff is an acquittee and his present confinement under maximum-security conditions constitutes a miscarriage of justice. The defendants finding and decision contains no factual basis to support the conclusion that

plaintiff suffers from a psychiatric disability that would warrant confinement to the most restrictive setting in maximum security. The findings of all the treatment professionals and all the clinical evidence supporting those findings, at most, demonstrates a possibility that plaintiff might decompensate into dissociative condition, upon a long exposure to the disinhibiting effects of alcohol and cocaine, should he resume their use, and while in such a state, might possibly present a risk of harm to himself or others. The defendants decision and order was clearly erroneous and is based on a string of completely unsupported suppositions that ultimately deprived the plaintiff of his right to liberty to be free from undue restraint.

## CONCLUSION

It is respectfully submitted that for each of the forgoing reasons, the Honorable Court should grant summary judgement on liability to the plaintiff on his due process claim and enter a declaratory judgement.

Respectfully Submitted

Robert Kalman, Pro se
Whiting Forensic Institute
P.O. Box 70 O'Brien Dr.
Middletown, CT 06457

26

Steven C. Stack                                              Page 13
Assistant Clerk of the Court                    Re: Kalman, Robert
GA# 23 Courthouse                                   March 15, 2002

directed toward himself or others. He denies any propensity toward violence. Mr. Kalman is oriented in time, place, and person. He shows no memory deficits for immediate (three out of three objects after five minutes), recent (what he had for lunch yesterday), and remote (his recollection of life in Romania) memories. His capacity for concentration is intact (he does serial sevens). His ability to abstract is intact. His insight is fair. His judgement is potentially impaired by drug and alcohol use.

**FORMULATION:** In light of the available information, Mr. Kalman's psychiatric difficulties appear to have stemmed from his excessive and prolonged abuse of alcohol and cocaine. His hospitalization for depression in his childhood is noteworthy, but appears to have been a single episode, probably a reaction to the physical abuse that he suffered, and it appears to have resolved through a short course of treatment.

According to current interviews, Mr. Kalman's behavior and mood changed during the mid-1990s with the onset of his alcohol abuse. According to available information, Mr. Kalman's behavior brought him to the attention of the police, beginning in 1999. He has been previously diagnosed with Bipolar Disorder and Schizoaffective Disorder, in addition to Alcohol Dependence and Cocaine Dependence. The diagnosis of PostTraumatic Stress Disorder has been raised on two previous occasions, and the diagnosis of Antisocial Personality Disorder has been made several times.

Mr. Kalman has not demonstrated evidence of a thought disorder or a mood disorder during this current period of hospitalization. Mr. Kalman's pattern of use of alcohol and cocaine demonstrated his dependence on these substances. He abused increasing amounts over time and developed a tolerance to both. He reported and was treated for withdrawal symptoms on the occasions when he stopped using. He had no previous success in controlling his substance abuse. His use of substances was a part of his daily routine, as was his other drug-related activity. Mr. Kalman's functioning was significantly impaired by his substance use. As a result, his primary diagnoses are substance-related.

No evidence of psychosis was observed during this hospitalization. Previously reported episodes of psychosis may have been the result of his alcohol and cocaine use. Therefore, the evaluation team offers the following diagnoses:

Diagnosis:

| | | |
|---|---|---|
| AXIS I: | 303.90 | Alcohol Dependence, in remission in a controlled environment |
| | 304.20 | Cocaine Dependence, in remission in a controlled environment |
| | 292.84 | Other Substance-Induced Mood Disorder (cocaine and alcohol) |
| AXIS II: | V71.01 | Adult Antisocial Personality Disorder |
| AXIS III: | V70.5 | No Diagnosis |
| AXIS IV: | | Problems related to interaction with legal system/crime |
| AXIS V: | | Current GAF  50 |

# STATE OF CONNECTICUT

### PSYCHIATRIC SECURITY REVIEW BOARD

RE:    ROBERT KALMAN

Psychiatric Security Review Board
ID Number: 0291  DOB: 7/18/70
Document Number: 03-02-3275

## MEMORANDUM OF DECISION

On January 10, 2003, the Psychiatric Security Review Board held a hearing to review the commitment of Robert Kalman to its jurisdiction, pursuant to Connecticut General Statutes, Section 17a-583.

Robert Kalman was committed to the jurisdiction of the Psychiatric Security Review Board on September 25, 2002 by the New Haven Superior Court for a period of time not to exceed 35 years after he was acquitted by reason of mental disease or defect of the charges of Illegal Possession of Explosives, Failure to Appear in the First Degree and two counts of Risk of Injury.

At the hearing, the parties appearing were Assistant State's Attorney Susan Filan, representing the Chief State's Attorney's Office; Robert Kalman, the acquittee, represented by Attorney Glen Conway. The witnesses were Alexandre Carre, M.D., and Sabita Rathi, M.D., of the Whiting Service of Connecticut Valley Hospital.

Dr. Carre, the attending psychiatrist who evaluated Robert Kalman for a seven month period on Whiting's Admission Unit, testified as follows: Mr. Kalman was on the Admission Unit from October 30, 2001 until August 2, 2002. He fully participated in the evaluation process. For the most part, Mr. Kalman was polite, cooperative, maintained a quiet routine and was generally not considered a management problem. He attended all of his groups, although he often preferred solitary activity. His primary socialization activity is to maintain frequent telephone contact and visitation with family and friends. Psychological testing revealed that Mr. Kalman does not openly admit to experiencing psychological difficulties. He is troubled by negative emotions and likely to experience depression and anxiety. He has few outlets for expressing intense emotion and was not adept at handling these emotions without the use of drugs and alcohol. Mr. Kalman expects to have negative experiences with others. He is deeply distrustful of others and feels cheated and misunderstood in his interactions with others. Mr. Kalman resents authority and likes to think of himself as a rebellious individual with little regard for social convention. He believes that he has had fewer opportunities to make a good life for himself than his peers. The anger and resentful feelings that those situations generate are likely to make him behave in an impulsive manner and further hamper his ability to relate to others.

Dr. Carre further testified as follows: Initially, Mr. Kalman was on a medication regime of the antipsychotic medication Zyprexa and the mood stabilizer Depakote; these drugs were gradually discontinued. As he came off these medications, his mental status remained stable and continued to remain stable for a long period of time. In May or June 2002, a different picture of Mr. Kalman emerged. He began to engage the treatment team in one-upmanship, questioning decisions made, minimizing the validity of others made, and not respecting his own boundaries. There was an administrative decision to transfer Mr. Kalman to Unit 2, where he spent approximately two months. It is documented that he was not cooperative on that unit and was transferred to Unit 4.

Telephone# (860) 566-1441 • Facsimile# (860) 566-1425

505 Hudson Street, First Floor • Hartford, Connecticut 06106-7107
website address: www.dmhas.state.ct.us/psrb

*An Equal Opportunity Employer*

Memorandum of Decision
Re: Robert Kalman
Document #:  03-02-3275

## ORDER

Pursuant to Connecticut General Statutes, Sections 17a-584, 17a-586 and 17a-599, the Psychiatric Security Review Board hereby ORDERS:

1.  Robert Kalman shall remain confined at the Whiting Service of Connecticut Valley Hospital for the purposes of care, custody and treatment.  This order of confinement pursuant to CGS Section 17a-584 may be appealed in accordance with the provisions of Section 17a-597 and Chapter 54 of the Connecticut General Statutes.

2.  Further the Board orders that the confinement of Robert Kalman be under maximum-security conditions.

3.  The Whiting Service of Connecticut Valley Hospital shall report every six months to the Psychiatric Security Review Board on the mental condition, mental status, and course of treatment of Robert Kalman, pursuant to Connecticut General Statutes, Section 17a-586.  The first such report is due no later than July 31, 2003, and then every six months subsequent to the due date of the first report.

Dated:  February 21, 2003

Psychiatric Security Review Board

Martha E. Lewis, Executive Director
On Behalf of the
Psychiatric Security Review Board

pc    Assistant State's Attorney Susan Filan
      Attorney Glen Conway
      Public Defender Monte P. Radler
      Marilyn R. Smith-Cotterell, LCSW
      Michael Lah, Ph.D.
      DMHAS Conditional Release Service Unit
      √Robert Kalman

## **CERTIFICATION**

I hereby certify that a copy of the forgoing Brief in Support of Plaintiff's Motion for Summary Judgement, was mailed in accordance with Rule 5 (b) of the Federal Rules of Civil Procedure on this 29th, day of October 2003 to:

Richard J. Lynch
Assistant Attorney General
55 Elm Street, P. O. Box 120
Hartford, CT 06141 – 0120

Robert Kalman, Pro se,