## Exhibit B

**Psychiatric Evaluation**

**Peter M. Zeman, M.D.**
**Senior Consultant**
**Forensic Consultation Service**

THE INSTITUTE OF LIVING
MEDICAL GROUP, P.C.

**July 18, 2002**



**THE INSTITUTE OF LIVING
MEDICAL GROUP, P.C.**

July 18, 2002

Attorney Glenn M. Conway
Knight, Conway & Cerritelli, LLC
7-9 Elm Street, 2nd Floor Left
New Haven, CT 06510

Re:   Robert Kalman
Age:  31
DOB:  7-18-70

Dear Attorney Conway:

In response to your written requests of June 20 and July 11, 2002, I completed a psychiatric evaluation on Mr. Robert Kalman. Mr. Kalman is presently hospitalized at the Whiting Forensic Division of Connecticut Valley Hospital after having been found not guilty by reason of mental disease or defect of Illegal Possession of Explosives, Failure to Appear in the first degree, and two counts of Risk of Injury to a Minor. You have asked that I summarize my findings in writing and address the following issues:

1)   Diagnosis.
2)   Prognosis.
3)   Whether Mr. Kalman is a danger to others.
4)   Relevant risk factors which would be operative once Mr. Kalman is in the community and the manner in which these risk factors should be addressed.
5)   The best course of treatment for Mr. Kalman.
6)   Recommendations and rationale as to the best treatment location for Mr. Kalman at this time.

At the beginning of my first interview with your client, I identified myself as a psychiatrist who had been retained by your office to complete a psychiatric evaluation. I informed him that my interviews were not confidential but that they would be used as the basis for a report to you. I also informed him that I might be called upon to testify in court and at a hearing of the Psychiatric Security Review Board. Mr. Kalman understood the limits of confidentiality inherent in this

evaluation, and he agreed to my proceeding. He also signed a written authorization permitting me to send you this report.

My evaluation included two interviews of Mr. Kalman, both held in the visiting room at the Whiting Forensic Division of Connecticut Valley Hospital. The first interview was on June 24, 2002, for two hours and the second on June 28, 2002, for one and one-half hours. I also reviewed extensive written information concerning this case which included a letter dated March 15, 2002, submitted to the New Haven Superior Court by Mr. Kalman's Whiting Forensic Division evaluation team. The packet sent to me also provided the following: a letter by Peter L. Mohrer, M.D.; psychiatric records from Connecticut Mental Health Center, New Haven, Connecticut; psychiatric records from Connecticut Valley Hospital; psychiatric records from Harbor Health Services, Inc.; police reports concerning the events which led to the charges against Mr. Kalman; and the transcript of a motion to suppress hearing, dated October 11, 2001. Finally, I reviewed written information given to me directly by Mr. Kalman at the time of my first interview of him. Much of the material which Mr. Kalman gave to me had been included in the written information sent by your office.

Family and personal history revealed that Mr. Kalman was born and raised in Romania in a family which was rendered seriously dysfunctional as a result of his father's severe alcoholism. Mr. Kalman was severely beaten many times by his father during his childhood and adolescence. Mr. Kalman recalled that, when he was age 13 or 14, his father attempted to choke him on at least two occasions. He has had no contact with his father for many years. His mother, Erma Kalman, age 52, lives in Hamden, Connecticut, and the patient maintains a very good relationship with her. One sister lives in North Haven and suffers from PTSD. In describing his recollections of his upbringing, Mr. Kalman stated, "My father was violent for no reason. My mother did everything for us." Family psychiatric history revealed the paternal grandfather committed suicide.

Mr. Kalman attended school through the 10th grade in Romania. He did not continue formal education after immigrating to the United States. Mr. Kalman had "learning problems" in math and writing but did well in history, chemistry, and geography. Mr. Kalman reportedly had many fights and disputes with his classmates during his school career.

Mr. Kalman came to the United States in 1988 at age 18. He lived with his family in upstate New York until moving with them to Hamden, Connecticut in 1989. Mr. Kalman's parents were finally separated in 1991, and his father returned to Europe at that time.

Work history revealed that Mr. Kalman worked for approximately one year in a lumberyard in upstate New York following his arrival in the United States. From 1989 to 1990, he was employed at Universal Metal Works in North Haven,

Connecticut. From 1990 to 1999, he worked at Dunkin Donuts as a baker. Following a dispute with his boss, he left Dunkin Donuts and has not worked since.

Mr. Kalman was married from age 24 through 26 to "Olympia." He first spoke to his future wife on the telephone as she was a telephone operator in Romania at the time. Within six months, they were married, and his wife joined him in Connecticut one year later. Their marriage floundered after Olympia became pregnant and ended the pregnancy by an abortion without telling her husband. It appeared to Mr. Kalman that his wife placed her career interest over her family, and he initiated divorce proceedings. According to Mr. Kalman, he began to abuse substances heavily during the marriage.

Following his divorce, Mr. Kalman had a relationship with "Michelle." This relationship also failed, and a daughter born to the couple is now in state custody. For the past three years, Mr. Kalman has been living with "Danielle" and they have a two-year-old daughter. Mr. Kalman had known Danielle for many years from their employment together at Dunkin Donuts, and they became involved with each other when he was working there. Danielle also has two teenage children from a prior relationship. Mr. Kalman described his relationship with Danielle in positive terms but generally was quite vague in terms of particular details about their life together.

Medical history revealed that, at age six or seven, Mr. Kalman fell and struck his head with a brief loss of consciousness. He was treated for what appears to be a minor head injury and returned home the same day. Mr. Kalman also sustained various physical injuries, the exact nature of which is unclear, from repeated physical abuse by his father. Reportedly, the father beat Mr. Kalman severely on many occasions. Following one of these beatings, at age 13 or 14, Mr. Kalman was hospitalized psychiatrically for several months and received medication. There were no other psychiatric hospitalizations during his adolescent years. Furthermore, there is no documented psychiatric history prior to the events which led to his current series of hospitalizations.

On September 24, 2000, Mr. Kalman was brought by his family to the Yale New Haven Hospital emergency room because of bizarre behavior which included his placing a cross and a flag on the steps of the New Haven Court House and his making threatening remarks. He was admitted from the emergency room to the Connecticut Mental Health Center where he reported his belief that members of the Hell's Angels and Huns motorcycle gangs were after him. There was apparently validity to this concern as he had been warned by the State's Attorney of the animosity of these gangs toward him. When I asked Mr. Kalman why he had placed the cross and the flag, he replied that he had "no idea." He did state that he had used a substantial amount of cocaine and alcohol just prior to this incident. Furthermore, on at least two occasions while an inpatient at

ATTORNEY GLENN M. CONWAY
**RE: ROBERT KALMAN**
4

Connecticut Mental Health Center, Mr. Kalman used cocaine which he had arranged to be brought to him by a visitor.

On October 12, 2000, it was planned to discharge Mr. Kalman from Connecticut Mental Health Center back to the custody of the New Haven police. At that time, the patient became extremely anxious and attempted to escape by exiting through a window. He also reported that he had a mercury capsule in his mouth and threatened to commit suicide by ingesting it. This resulted in his transfer to the Yale New Haven Hospital emergency room from which he was admitted to the Whiting Forensic Division of Connecticut Valley Hospital on October 13, 2000.

During this first hospitalization at Whiting, Mr. Kalman was treated with Zyprexa (an antipsychotic medication), Klonopin (an antianxiety medication), and Depakote (a mood stabilizing medication). Mr. Kalman's grandiose and tangential thinking resolved. He himself admitted that he had been intoxicated from substances at the time of much of his disorganized and self-destructive behavior. After a brief period of incarceration at Garner Correctional Institution from November 16 through December 5, 2000, Mr. Kalman was released on bond.

From December 8, 2000, to October 5, 2001, Mr. Kalman was treated psychiatrically on an outpatient basis at Harbor Health Services, Inc. He was diagnosed with Bipolar Disorder, Alcohol and Cocaine Abuse, and Antisocial Personality Disorder. He was maintained on Zyprexa and Depakote and treated in Harbor Health Services' intensive outpatient program. According to Harbor Health's records, Mr. Kalman was compliant with prescribed medication and cooperative in all aspects of his treatment. He tended to minimize and deny the seriousness of his substance dependence and admitted to drinking wine on at least one occasion.

Mr. Kalman was again incarcerated on October 22, 2001, after he removed the electronic monitoring bracelet that was a condition of his bond. When I asked Mr. Kalman why he had removed the bracelet, he replied, "I was drunk, and I cut it off."

Mr. Kalman described for me two incidents which led to arrests. During one, he was hanging onto the back of a car which drove off, ignoring a command from a police officer to stop. Mr. Kalman then fled on foot. During another incident, he reportedly took an AK-47 from a case and pointed it at another man with whom he was fighting. Mr. Kalman told me that he had been heavily intoxicated from alcohol before both incidents. He claimed no recollection for the incident with the automatic weapon.

On June 27, 2000, as a result of the incident on June 4, 2000, involving the AK-47, police executed a search and seizure warrant at Mr. Kalman's home. Found at the time of that search were several explosive devices and fireworks, several packets of cocaine, a variety of items used for packaging cocaine, and a large trash barrel full of empty beer bottles. As a result of this search, several charges were brought and Mr. Kalman was found not guilty by reason of mental disease or defect, on October 30, 2001, of Illegal Possession of Explosives, Risk of Injury (two counts), and Failure to Appear, first degree. Two additional charges on which the jury could not agree were Sale of Hallucinogenics/Narcotics and Operation of a Drug Factory. In speaking of the events surrounding this search and seizure, Mr. Kalman stated, "I was drinking the night before and had used drugs the night before. I wasn't upset at all, and I totally cooperated." During the interview, his attitude about all of these events was very casual and relaxed.

Alcohol and drug history revealed that Mr. Kalman did not drink, except rarely, until age 25. At that time, his wife "had an abortion against my will and I blamed myself for it." He stated that he began to drink heavily after that time. Approximately six months after starting his heavy alcohol use, he began to use cocaine and has continued to use it extensively for six years. In the history which he provided to me, Mr. Kalman attributed all of his abberant behavior to his heavy dependence upon alcohol and cocaine. He denied opiate, amphetamine, or sedative dependance or abuse.

My mental status examination, which is an assessment of Mr. Kalman's thoughts, feelings, and behavior at the time of my interviews of him, revealed him to be alert and cooperative. His thinking was logical, coherent, and goal-directed, and there was no evidence of loosening of thought associations, blocking of thought, flight of ideas, or delusional thinking. There were no hallucinations or other disorders of perception. His mood was normothymic with no evidence during my interviews of depression, significant anxiety, or hypomanic or manic elevation of mood. Sensorium was clear, and orientation was present to time, place and person. Remote and recent memory and immediate recall were intact. Intelligence was estimated to be within the average range. Reasoning and judgment were impaired in terms of Mr. Kalman's marked denial of the severity of his alcohol and drug dependence.

Based upon my psychiatric evaluation which included two interviews of Mr. Kalman and review of the written information referenced in this report, I have reached the following diagnoses:

Axis I       Alcohol Dependence, in remission in a controlled environment (303.90).

             Cocaine Dependence, in remission in a controlled environment (304.20)..

Axis II        Antisocial Personality Disorder (301.7).

In my opinion, there is no persuasive clinical evidence that Mr. Kalman has suffered from a Bipolar Disorder. He certainly shows no evidence of such a disorder at present, and it is highly likely that what was thought to be manifestations of this disorder in the past were actually resultant from his heavy use of cocaine and alcohol. Cocaine in particular can mimic the symptomatology of bipolar illness. Mr. Kalman, by his own admission, was using substantial amounts of both cocaine and alcohol at the time of his disorganized and frenetic behavior which, in retrospect, was very probably misdiagnosed as bipolar. Another consideration which would argue against the diagnosis of Bipolar Disorder is the fact that Mr. Kalman has been for several months without any psychiatric medication, and there has been no recurrence of any bipolar symptomatology.

I believe him to have a good prognosis with further treatment. Such treatment must initially include an extended further period of inpatient care. Although Mr. Kalman does not present a danger to himself or others within a structured hospital setting, it is very likely, were he to be in the community at this time, that he would resume his abuse of alcohol and cocaine and would rapidly become dependent upon both of these substances. Upon the resumption of alcohol and cocaine use, it is probable that Mr. Kalman would present a danger to himself and others. I base this opinion upon his past behavior while intoxicated with alcohol and cocaine during which he carried out a number of dangerous actions which placed both himself and others in peril. Mr. Kalman's demonstrated lack of judgment in the past while intoxicated causes me concern that such behavior would recur should he resume substance use.

In my opinion, Mr. Kalman is not ready at this time for return to the community. The course of treatment which will best help him is an extended further period in a structured hospital setting where he can participate in intensive therapy in an environment of enforced sobriety. In such an environment, an important part of his treatment will be his repeatedly being confronted with the consequences of his own behavior and with the expectation that he take personal responsibility for his actions rather than attempting to displace this responsibility upon others.

Although Mr. Kalman requires the structured setting of the hospital at this time, it is my opinion that he does not require the maximum security setting of the Whiting Forensic Division but rather can be safely treated in Dutcher Hall. His most recent hospitalization in the Whiting Forensic Division has been for the past nine months. Upon review of Whiting's progress notes for this period, I find that there has been no evidence of psychosis nor has Mr. Kalman been uncooperative or disruptive. It appears to me that he has been fully cooperative with all of the unit rules and procedures and with all aspects of his plan. There

ATTORNEY GLENN M. CONWAY
**RE: ROBERT KALMAN**                                                            7

has been no behavior which has presented any danger to himself or others. For all of these reasons, I believe that he can be safely and productively treated at this time in Dutcher Hall.

In the future, when Mr. Kalman does transition to the community, he will require extremely close supervision including supervised housing and twice weekly urine tests for alcohol and cocaine. The risk factors of most concern at that time would be those attendant upon the disinhibiting effects of alcohol and cocaine, should he resume their use.

Please feel free to contact me if you have any questions concerning the findings and opinions set forth in this report.

                        Sincerely,

                        Peter M. Zeman, M.D.
                        Senior Consultant
                        Forensic Consultation Service

/jc

## CERTIFICATION

I hereby certify that a copy of the forgoing <u>Psychiatric Evaluation, Exhibit B,</u> was mailed in accordance with Rule 5 (b) of the Federal Rules of Civil Procedure on this 29th, day of October 2003 to:

Richard J. Lynch
Assistant Attorney General
55 Elm Street, P. O. Box 120
Hartford, CT 06141 – 0120


                                                            Robert Kalman, Pro se,