**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED

2003 NOV 12  P 5: 40

US DISTRICT COURT
BRIDGEPORT CT

| | | |
|---|---|---|
| ROBERT KALMAN, | : | **PRISONER** |
| Plaintiff, | | |
| V. | : | **Civil Action No. 3: 03cv 671** |
| | | **(DJS) (TPS)** |
| ROBERT BERGER, et al., | : | |
| Defendants, | | November 9, 2003 |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

## STATEMENT OF THE CASE

This civil action involves no claim for monetary damages of any kind or for recovery of property. This action was brought to this Honorable Court as a Declaratory Judgement filed under the American with Disabilities Act, Title II, 28 C.F.R., Sec., 35.172, the Federal Declaratory Judgements Act, 28 U.S.C., Sec., 2201, and pursuant the Civil Rights Act, 42 U.S.C., Sec., 1983.

The pro se, plaintiff is a resident of the Connecticut Valley Hospital and he is confined under the most restrictive setting, in the maximum-security division at Whiting Forensic Institute. Plaintiff in this motion seeks summary judgement for his claims under the American with Disabilities Act.

## ORAL ARGUMENT REQUESTED

1

## STATEMENT OF THE FACTS

As set fourth in the accompanying declaration the plaintiff, following a trial before a jury of six, the jury found the plaintiff not criminally responsible by reason of mental disease or defect. Defendants Robert Berger, John Ryan, Janet Williams, Sylvia Cancela and Susan Blair, after an Initial Commitment Hearing, held pursuant Conn. Gen. Stat. Sec., 17a-583 ordered the plaintiff confined under the most restrictive conditions at Whiting Forensic Institute.

Conn. Gen. Stat. Sec., 17a-583, mandates the defendants to "(a) conduct a hearing to review the status of the acquittee within ninety days of an order committing an acquittee to the jurisdiction of the board.... (b) At any hearing held pursuant to this section, the board shall make a **finding** and act pursuant to section 17a-584." Section 17a-584 provides in pertinent part that "[a]t any hearing before the board considering the discharge, conditional release or confinement of the acquittee,...., the board **shall make a finding as to the mental condition of the acquittee** and considering that its primary concern is the protection of society, shall do one of the following:" either (1) discharge the acquittee; (2) conditionally release the acquittee: or (3) confine the acquittee "in a hospital for psychiatric disabilities." "[a]t any time the court or the **board** determines that the acquittee is a person who should be

confined, **it shall make a further determination of whether the acquittee is so violent as to require confinement under conditions of maximum security..**" Conn. Gen. Stat. Sec., 17a-599, in pertinent part.

On January 10, 2003, the defendants held the Initial Commitment Hearing pursuant to Sec., 17a-583, where two medical experts testified and concluded that plaintiff could be placed productively and appropriately in a less restrictive and more integrative setting.

On February 21, 2003, defendants issued a Memorandum of Decision ordering the plaintiff confined within a maximum-security setting.

The Memorandum of Decision issued by defendants on February 21st, 2003 states that Robert Kalman **"is so violent that he requires confinement within a maximum-security setting."** The finding and order was clearly erroneous in view of the reliable, probative and substantive evidence on the record, and thereby depriving the plaintiff of the due process of law. Plaintiff is denied the benefits of services, activities, opportunities, advantages, and rights enjoyed by others in the least restrictive setting. The extent to which the defendants have construed "so violent as to require confinement under conditions of maximum security" to include the plaintiff within the class of individuals to which it applies violates Amendment Fourteenth of the United States Constitution.

**ARGUMENT**

**POINT I**

**PLAINTIFF'S CONFINEMENT IN MAXIMUM-SECURITY DEPRIVES THE PLAINTIFF OF THE BENEFIT OF SERVICES, PROGRAMS, RIGHTS, AND ACTIVITIES ENJOYED BY OTHERS IN THE MOST INTEGRATED AND LEAST RESTRICTIVE SETTING APPROPRIAT IN VIOLATION OF THE AMERICAN WITH DISABILITIES ACT, AND THE UNITED STATES COUNSTITUTION**

From time in memorial, those who suffered from psychiatric disabilities were considered something less than totally human and were often characterized by such unkind and disparaging labels as lunatics, imbeciles and morons. As the medical profession has gained knowledge of and insight into the sources of psychiatric disabilities, the court's in particular, have become more sensitized to the needs of individuals with psychiatric disabilities. Both the United States and Connecticut Constitutions mandate that all citizens be afforded the equal protection of the laws and the right to due process, before the State can deprive them of there liberty. On January 10th, 2003, Dr. Alexander Carre, M.D. testified that the plaintiff has been "an exemplary patient" from his initial commitment through the time Whiting submitted its report on March 15, 2002. Dr. Carre' was quoting from the report submitted to the Superior Court pursuant to Conn. Gen. Stat. Sec., 17a-582, and this report reflects that the Diagnostic

4

team from Whiting Forensic determined that plaintiff is an acquittee with primary diagnosis related to substance dependence. Under Axis II, it is reflected that the Diagnostic Team and Dr. Carre had found a "**V 71.01 Adult Antisocial Personality Disorder**". The **DSM-IV-TR**, American Psychiatric Association's Diagnostic and Statistical Manual states that:

**"V71.01 Adult Antisocial Behavior**

> This category can be used when the focus of clinical attention is adult antisocial behavior that is not due to a mental disorder (e.g., Conduct Disorder, Antisocial Personality Disorder, or an Impulse-Control Disorder). Examples include the behavior of some professional thieves, racketeers, or dealers in illegal substances." P# 310

In other words Dr. Carre and the Diagnostic Team classified the plaintiff as a criminal. The clinical evidence reflects that the plaintiff at the time of his admission to Whiting was free of psychiatric symptoms and Dr. Carre and Diagnostic Team therefore discontinued plaintiff's psychotropic medication regiment and changed the plaintiff's diagnosis.

The greatest challenge that confronts a jury or a judge is to look below the surface of the case and behind the stigma to see an individual who has dreams and aspirations, fears and doubts, just like any other person. If these views and thoughts are not forcefully presented, society will be the loser and the individual will have been denied his or her God-given right to grow to

the fullest potential. There is no dispute that, historically, no group of individuals with psychiatric disabilities have been more deprived of treatment, discriminated against, or mistreated than individuals hospitalized following of a finding of not guilty by reason of insanity (NGRI). In the United States several courts have suggested that insanity acquittee's retain the same right to treatment as civilly committed citizens. See, **Marshall v. Kort,** 690 P. 2d 219, 223-24 (Colo. 1984); **State in the Interest of R.G.W.**, 145 N.J. Super. 167, 366 A. 2d 1375 (Jur. & Dom. Rel. Ct, 197); **Henderson v. McDonald**, 857 F. Supp. 49 (N.D. Ill. 1994); (younger abstention appropriate were plaintiffs were actively litigating question of adequacy of their treatment plans in state court Burford abstention inapplicable).

The District of Connecticut had recognized that Insanity Acquittees have equal rights to appropriate psychiatric treatment in the class action **William Roe, et al., v. Michael Hogan, et al**. Civil No. H89 – 579 (PCD) December 5, 1990 **AGREEMENT OF SETTLEMENT** "No Connecticut Psychiatric Security Review Board Patient shall be denied access to appropriate therapeutic, recreational, rehabilitative or leisure activities which are available to other patients solely because of the patients' commitment to

6

the Connecticut Psychiatric Security Review Board. All decisions concerning the care and treatment of Connecticut Psychiatric Security Review Board patients shall be made on the basis of individual evaluations and assessments, the results of which shall be properly documented in the patients record."

Moreover, the District of Connecticut held that "all patients…at state-created facilities of the Department of Mental health shall at all times be placed in the least restrictive setting possible consistent with their own safety and treatment and the safety of others." **Williams v. Plaut**, Civil No. H 78-111 (D. Conn. 1980)(consent decree); see, **Lake v. Cameron**, 364 F2d 657 (D.C. Cir. 1966); see also Conn. Gen. Stat. Sec., 17a-541, 17a-542. The State Supreme Court in **Mahoney v. Lensik**, 213 Connecticut states that "the primary function of any psychiatric facility is to diagnose, treat and to restore mentally disturbed persons to an optional level of functioning" and that the concept of a "humane and dignified treatment" means" a meaningful right to treatment" Id at 565. "[M]eaningful treatment thus requires not only basic custodial care but also an individualized effort to help each patient by formulating, administering and monitoring a specialized treatment plan." The plaintiff claims that due to defendant's order entered on February 21, 2003 and due to the classification that plaintiff is "so violent" he is deprived

of appropriate treatment equally to civilly committed patients as well as other patients committed to the Connecticut Psychiatric Security Review Board.

**First**; plaintiff is deprived of appropriate treatment services consistent with his individual clinical status as provided by Congressional Regulation, Connecticut State Law, by having been wrongfully classified by defendants as "so violent" and by having been ordered confined in maximum-security facility in a restrictive classification setting that deprives plaintiff of increasing levels of freedom and responsibility equal to civilly committed patients, and other Connecticut Psychiatric Security Review Board patients.

**Second**; plaintiff is deprived of increasing levels of freedom allowing him unsupervised on-campus passes, employment opportunities afforded to civilly committed patients, and other Connecticut Psychiatric Security Review Board patients who are given unsupervised on-campus passes to go to and from work.

**Third**; Plaintiff is denied the opportunity to exercise personal autonomy and responsibility for as much of his daily activities as clinically appropriate, in that he is restricted to levels of freedom that only allow him to go only in

the Whiting Forensic Institution courtyard regardless of his individual clinical status.

**Fourth**; the plaintiff is not allowed to go on off campus rehabilitative or leisure activities afforded to civilly committed patients and other Connecticut Psychiatric Security Review Board patients residing at Connecticut Valley Hospital.

**Fifth**; the plaintiff is not allowed consideration for temporary leaves, and is not eligible to be considered for transition into the community or given consideration for conditional release until he is transferred to a less restrictive setting to the Dutcher Service of Connecticut Valley Hospital

**Sixth**; the plaintiff is automatically considered to be dangerous and "so violent" and treated unequally by being deprived of appropriate treatment without regard for individualized consideration of his current mental status and without a determination of whether participation in a particular program or activity would pose a danger to him or others.

The findings supporting the defendant's conclusion that plaintiff is "so violent that he requires confinement in maximum-security" is simply far too tenuous and speculative to support a reasonable and logical conclusion that plaintiff presents a danger to himself or others justifying involuntary

commitment under the most restrictive conditions in a maximum security facility. Please see the Transcript of the Hearing Exhibit A. the record is devoid of any evidence showing that, since being committed plaintiff engaged in any behavior-causing harm to himself or to others.

It is recognized that unjustified institutional isolation of persons with disabilities is a form of discrimination. Institutional placement of persons who can handle and benefit from less restrictive or community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. See, **Cf. Allen v. Wright**, 468 U.S. 737, 755 (1984)("There can be no doubt that [stigmatizing injury often cased by racial discrimination] is one of the most serious consequences of discriminatory government action."); **Los Angeles Dept. of Water and Power v. Manhart,** 435 U.S. 702, 707, n. 13 (1978)(" 'In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of man and women resulting from sex stereotypes.'" (quoting **Sprogis v. United Air Lines, Inc**., 444 F. 2d 1194, 1198 (ca 7 1971)). The plaintiff asserts that his confinement at the Institute under the most restrictive setting severely diminishes his everyday life activities, including family relations, social

contacts, being deprived of work, economic independence, educational advancement, and of ethnic cultural enrichment. Moreover, plaintiff is denied the benefits of treatment services appropriate provided to civilly committed patients as well as to other patients committed to the Connecticut Psychiatric Security Review Board. The United States Supreme Court has long recognized that commitment to a mental hospital produces "a massive curtailment of liberty." See **Humphrey v. Cady**, 405 U.S. 504,509 (1972). In the context of a prisoner being transferred from a prison to a mental hospital, the Court unequivocally stated "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital can engender adverse social consequences to the individual and that [w]hether we label this phenomena stigma or choose to call it something else .... We recognize that it can occur and that it can have a very significant impact on the individual." See **Vitek v. Jones**, 445 U.S.480, 100 S. Ct. 1254,1263 (1980).


Dr. Alexandre Carre' M.D., reported to the defendants on January 10, 2003 that "We have not found **any significant evidence of a mental disorder**. We simply established the diagnosis of substance use disorder compounded with a personality disorder that put him at risk of offending in

the community." See Hearing Transcript 1/10/03, p. # 7 at 18. Dr. Sabita Rathi, M.D., the plaintiff's attending psychiatrist at the time of the hearing, (1/10/03) testified, *inter alia*, "Mr. Kalman was transferred from Unit 2 to Unit 4 on 10/15/02. **To date**, Mr. Kalman has not been a management or behavior problem on the unit. He has adjusted well to the unit. He has not been in any physical or verbal altercations with any staff or patients. He has been attending therapeutic and rehabilitation groups. He has, however, continued to be very focused on legal issues. He spends most of his time when not in groups, writing about legal issues." See, Transcript. P. # 8 at 9 to 17, (1/10/03)

Dr. Rathi provided the expert testimony that, **"On mental status exam, he's alert, oriented, cooperative. He shows no signs of psychomotor agitation. His mood is euthemic. His effect is full range. His thought processes are logical and goal directed. There's no indication of suicidal or homicidal ideation. There's no perceptual disturbances and no indication of other psychotic symptoms, including paranoia and delusions."** 1/10/03, Transcript p. # 9 at 9 to 16. As reflected above, every witness who testified at the hearing, noted that plaintiff at the time of the hearing has no significant psychiatric illness. All the provided testimony and

all the clinical evidence indicates that plaintiff has nether harmed himself or others. "one who by reason of insanity is acquitted of a crime and ...is committed to a mental hospital is entitled not only to treatment, but to treatment in the least restrictive alternative consistent with the legitimate purposes of a commitment." **Jackson v. United States**, 641A2d 454, 457(D.C.,1994) "The level of confinement is ...relevant to the inquiry that the [court] has to make when an acquittee seeks a change in the manner of his confinement." **Reese v. United States**, 614 A. 2d 506, 511 (1992).

The United States Supreme Court has found that the American with Disabilities Act applies to state prisoners. See **Pennsylvania Department of Corrections v. Yeskey**, 118 S. Ct. 1952 (1998), on remand, 76 F. Supp. 2d 572 (M.D.Pa. 1999). Also see **42 U.S. C., Sec., 12131(2)**. In the present action the plaintiff is an individual who meets the essential eligibility requirements for the receipt of services or for participation in programs or activities provided by a public entity. The plaintiff is a NGRI acquittee and he is committed to the jurisdiction of the defendants for the purpose of care, custody and treatment. Subsequently, to the Supreme Court's decision in **Yeskey**, the Supreme Court considered the right of institutionalized persons with psychiatric disabilities to services and to benefits in the least and most

integrated setting in the landmark decision of **Olmsted v. L.C. and E.W**. 119 S. Ct. 2176 (1999). In **Olmsted** the plaintiffs' L.C. and E.W. challenged their placement at Georgia State Hospital, arguing that Title II of the American with Disabilities Act, entitled them to the **"most integrated setting appropriate to [their] needs." Id. at 895.**

The Supreme Court had found that the American with Disabilities Act, entitled L.C. and E. D., to treatment in an "integrated community setting" as opposed to an "unnecessarily segregated" state hospital. The "least restrictive language" means "that the treatment must be the best treatment for the acquittee that protects the public safety." Id.(emphasis added). Illinois has codified a right to the least restrictive setting in Section 2-102(a) of the Mental Health Code which states that "[a] recipient of services shall be provided with adequate and humane care and services in the least restrictive environment." 405ILCS. 4/2-102 (a)(2002). A 111 "The mere fact that plaintiffs have been involuntarily committed as NGRI acquittees does not deprive them of substantive liberty interests under the fourteenth amendment." **C.J. v. Dept. of Mental Health and Developmental Disabilities**, 296 Ill. App. 3d 17,27,693 N.E. 2d 1209, 1215 (1998)(citing **Vitek v. Jones**, 445 U.S. 480, 491 (1979)). "Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due

14

Process Clause from arbitrary governmental actions." C.J., 693 N.E.2d at 1215 (quoting **Greenhotz v. Inmates of Nebraska Penal & Correctional Complex**, 442 U.S. 1, 18 (1979))(Powell, J., concurring in part and dissenting in part)). The Connecticut and the United States Constitutions mandate that a person shall not be deprived of life, liberty or property without due process of law. "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' **Adingtom v. Texas**, 441 U.S. 418, 425, 99 S. Ct. 1804, 1810,60 L.Ed.2d 323,332 (1979). Due Process requires the State to establish, by clear and convincing evidence, that the individual is both mentally ill and dangerous to justify involuntary civil commitment. Id., 426-27. (**Adington** standard). The defendants must have "a constitutionally adequate purpose for the confinement." **O'Connor v. Donaldson**, 422 U.S. 563,574, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975). Moreover, "[I]n **Foucha v. Louisiana**, the Supreme Court recognized that freedom from bodily restraint is a liberty interest that applies to insanity acquittees. **Foucha v. Louisiana**, 504 U.S. 71,80 (1992)." 693 **C.J., N.E**. 2d at 1216. Even when acquittees are found to be in need of a secure placement, the "secure setting is in effect the least restrictive environment permitted for NGRI acquittees under the law…" **C.J.,** 693 N.E. 2d at 1213. In New York, in the case of insanity acquittees,

the legislature has outlined procedures for insuring that people committed are not in a secure facility when they can be safely treated in a less restrictive environment. **People v. Betances**, 176 Misc. 2d 66, 71, 671 N.Y.S. 2d 930 (1998). "There is no logical reason to believe that, in prescribing care and treatment at an appropriate institution, the Legislature intended harsher treatment for a patient who is merely accused of a nonviolent criminal act, but not proven to have committed any crime at all, than one found not responsible by reason of mental disease or defect." **Id.**

The level of restraint does not need to be so high as to "eliminate that risk altogether." In re **J.L.J., 196 N.J. Super**. At 47, 481 A. 2d at 570. In addition to protecting the state-created liberty interest, commitment of an insanity acquittee confers additional responsibilities on the state to minimize restrictions. "Because the State necessarily retains substantial control over the individual's life and liberty in the process of arranging for appropriate placement, the individual's right must be protected by procedures designed to minimize restrictions on that liberty." In re **J.L.J. 196 N.J. Super**. At 46, 481 A. 2d at 569. Commitment must "responsibly minimize [] infringements upon defendants liberty and autonomy and give [] him the best opportunity to receive appropriate care and treatment." **Krol**. 68 N.J. at 257-58, 344 A. 2d at 300-01.

In the present case before the Court, if the defendants determine under subsection (3) of the Conn. Gen. Stat. Sec., 17a-584 that the plaintiff is an acquittee with psychiatric disabilities who should be confined, the defendants then must go on to determine whether under Section 17a-599, the plaintiff is so violent that he should be confined under conditions of maximum security. There was undisputed testimony by Dr. Carre' while he was cross-examined by plaintiffs' defense counsel that the plaintiff has no significant psychiatric disability and he is not violent. "**No,** I - - I had made it clear that Mr. Kalman **has never been violent** on the unit." H/T p #11 at 2.

In enacting the American with Disabilities Act, the U. S. Congress determined that discrimination against individuals with disabilities persists in a wide variety of areas of social life, including **"institutionalization," 42 U.S.C., Sec., 12101 (a)(3) (1995),** and that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion....[and] segregation...." 42 U.S.C., Sec. 12101(a)(5); **see also 42 U.S.C., Sec. 12101(a)(2); also see 28 C.F.R., part 35, subpart B, "General Requirements" Sec., 35.130.**

"As a general matter, the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous....As he was not convicted, he may not be punished. His confinement rests on his continued illness and dangerousness. **Jones v. United States**, 463 U.S. 354, 368-69, 102 S. Ct. 3043, 77 L.Ed. 2d 694 (1983)."(Internal quotation omitted.) **Payne v. Fairfield Hills Hospital**, 215 Conn. 675, 683-84, 578 A. 2d 1025 (1990). Thus, unlike a defendant who has been convicted of a crime, a defendant who has been found not guilty by reason of lack of capacity due to mental disease or defect is not criminally responsible for his or her unlawful conduct and, consequently, certain important goals of sentencing, including punishment and deterrence, are inapplicable." The Supreme Court of the State of Connecticut recognized "that the loss of liberty is all the more profound when the institution to which the patient **has been committed is a maximum security facility such as Whiting**." **Connelly v. Comm'r of Correction**, 258 Conn. 394, 405-406, 780 A. 2d 903 (2001).

Dr. Carre testified that: "Well, I **don't** think Whiting is the only place that could take care of Mr. Kalman's needs." Transcript p.# 22 at 1to3. A report written by Dr. Peter Zeman, a psychiatrist who conducted an independent evaluation of the plaintiff for the defense dated July 18, 2002, quoted from by the defendant Robert B. Berger, the Chairman of the PSRB while questioning Dr. Carre. Chairman Berger quoting the report of Dr. Zeman, M.D., Senior Consultant, The Institute of Living:

"Although Mr. Kalman does not present a danger to himself or others within a structured hospital setting, it is very **likely** were he to be in the community at this time, that he **would** resume his abuse of alcohol and cocaine and **would** rapidly become dependant upon both of these substances. **Upon** the resumption **of** alcohol and cocaine use, **it is probable that** Mr. Kalman would present a danger to himself and others." Transcript p. 23 at 5to 13.

Chairman Berger asked the question: "At the present time do you feel that Mr. Kalman needs to be in Whiting considering the statement of Dr. Zeman?" Dr. Carre: "I believe that Mr. Kalman needs to be an inpatient. Does he need the maximum security at Whiting, **I doubt it....**" P. 24 at 2-8

Dr. Rathi, testified that; "Yes, he would be good candidate for Dutcher, correct." 1/10/03, Transcript p. # 25 at 21 to 22. The evidence presented and all the clinical records demonstrate that plaintiff can be managed effectively and productively in the least restrictive setting. Dr. Carre' testified before the defendants that he and the Diagnostic Team from Whiting did not find any significant evidence of a mental disorder and plaintiff's mental status

continued to remain stable even after a rather long period of not being on any psychotropic medication. **See** also the **INTEGRATED CLINICAL SUMMERY AND CASE FORMULATION,** dated 12/21/01, Exhibit #1 and 2, attached to plaintiff's Declaration.   Dr. Carre made it clear that plaintiff was never violent on the unit and he and the diagnostic team could not diagnose plaintiff with any mental disorder or illness that qualifies as a defense to criminal conduct. Dr. Rathi emphasized that plaintiff's mental condition is intact and she concurred with Dr. Carre and with the Diagnostic Team's findings. Dr. Rathi agreed that plaintiff is a good candidate for a least restrictive setting. The report of Dr. Zeman, quoted by defendant Berger, stated that upon the resumption of substances and alcohol it is probable that the plaintiff may present a danger. See also Exhibit # 1 and 2 attached to plaintiff's Declaration.


The defendants decision and order was clearly erroneous and is based on a string of completely unsupported suppositions that ultimately deprived the plaintiff of his right to equal services and ordered plaintiff's unjustified institutional isolation in a maximum-security facility.

Plaintiff is confined to the most restrictive setting that deprives him of appropriate services, and increasing levels of freedom and responsibility for as much of his daily activities as clinically appropriate. The plaintiff is labeled "so violent" and confined to a restrictive setting that affords him none of the considerations and/or services provided to civilly committed citizens or other PSRB patients committed at Connecticut Valley Hospital.

## CONCLUSION

It is respectfully submitted that for each of the forgoing reasons, the Honorable Court should grant summary judgement on liability to the plaintiff on his ADA claim and enter a declaratory judgement.

DATED: November 9, 2003

Respectfully Submitted

Robert Kalman, Pro se
Whiting Forensic Institute
P.O. Box 70 O'Brien Dr.
Middletown, CT 06457

## **CERTIFICATION**

I hereby certify that a copy of the forgoing <u>Brief in Support of Plaintiff's Motion for Summary Judgement</u>, was mailed in accordance with Rule 5 (b) of the Federal Rules of Civil Procedure on this 9th, day of November 2003 to:


Richard J. Lynch
Assistant Attorney General
55 Elm Street, P. O. Box 120
Hartford, CT 06141 – 0120



Robert Kalman, Pro se,