# E.

PSYCHIATRIC SECURITY REVIEW BOARD

AT:    WHITING FORENSIC INSTITUTE
DIVISION OF THE CONNECTICUT VALLEY HOSPITAL
MIDDLETOWN, CONNECTCIUT

DATE:    JANUARY 10, 2003

IN RE:   ROBERT KALMAN - Initial Commitment
                    (CGS, Section 17a-583)

PSYCHIATRIC SECURITY REVIEW BOARD:

    Robert Berger, Esquire, Chairman
    John Ryan
    Sylvia Cancela
    Susan Blair
    Martha Lewis, Executive Director

FOR THE WHITING FORENSIC DIVISION:

    Dr. Alexandre Carre
    Dr. Sabita Rathi

FOR THE STATE:

    Susan Filan, ASA

FOR ROBERT KALMAN:

    Glen Conway, Esquire

ALSO IN ATTENDANCE:

    Robert Kalman

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1          . . .Verbatim proceedings of a hearing

2    before the Connecticut Psychiatric Security Review Board,

3    In Re: Robert Kalman, held on January 10, 2003, at 10:50

4    a.m., at the Whiting Forensic Institute, Middletown,

5    Connecticut . . .

6

7

8               CHAIRMAN ROBERT BERGER:  I call the

9    hearing to order in the matter of Robert Kalman and ask

10   those who are going to testify, to please rise and be

11   sworn.  Raise your right hands please.

12               (Whereupon, Dr. Alexandre Carre, Dr.

13   Sabita Rathi, and all potential witnesses were duly sworn

14   in.)

15               CHAIRMAN BERGER:  Please be seated.  Miss

16   Lewis, the background information please.

17               MS. MARTHA LEWIS:  The purpose of today's

18   hearing is to review the commitment of Robert Kalman to

19   the jurisdiction of the Psychiatric Security Review

20   Board, pursuant to Connecticut General Statute, Section

21   17a-583.

22               I have a one-page document, marked PSRB

23   Exhibit 1 with today's date, which lists all the

24   materials, which will be considered as evidence for

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    today's proceeding.

2              CHAIRMAN BERGER:  Thank you, Miss Lewis.

3    I call to the attention of both counsel there are only

4    four members of the Board present.  And one of those

5    members may have to leave before the hearing is

6    concluded.  If that transpires, we will have she and the

7    other members of the Board read the transcript so that

8    they can participate in the decision making process.  Is

9    there any objection?

10             MR. GLEN CONWAY:  No objection.

11             MS. SUSAN FILAN:  No objection.

12             CHAIRMAN BERGER:  Thank you very much.

13   Dr. Carre, are you going to start?

14             DR. ALEXANDRE CARRE:  Thank you, sir.

15   Mister --

16             CHAIRMAN BERGER:  If you would, just for

17   the record, your name and your position with the

18   hospital.

19             DR. CARRE:  Alexandre Carre, psychiatrist

20   on the admission unit, Unit 3 of the Whiting Forensic

21   Division of Connecticut Valley Hospital.

22             I had treated Mr. Kalman on the unit from

23   -- for seven -- for about seven months, from 10/30/01 to

24   his transfer to Unit 2 on 8/2/02.  Mr. Kalman is a 41-.

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    year-old, caucasian male of Hungarian decent acquitted on

2    October 30, '01 on the grounds of mental disease or

3    defect on charges of illegal possession of explosives,

4    risk of injury two counts, and failure to appear in the

5    first degree.  During that mandated evaluation, Mr.

6    Kalman fully participated in the process.

7                    Let me just read the parts of it to you

8    because it has been quite awhile.  He has remained

9    throughout his hospitalization -- actually part of it,

10   polite and cooperative, maintaining a quiet routine on

11   the unit, and generally not been a management problem.

12   He was able to approach staff appropriately with

13   questions and concerns and has been easily engaged in

14   contact with staff and would focus on serious topics, as

15   well as displaying an appropriate sense of humor.  He

16   attended all his groups and generally maintained a quiet

17   demeanor, often preferring solitary activity.  His

18   primary socialization interest had been to maintain

19   frequent telephone contacts and visitation with his

20   family and friends.

21                   The psychological testing that was done on

22   Mr. Kalman revealed that he does not openly admit to

23   experiencing psychological difficulties, he's troubled by

24   negative emotions, likely to experience depression and

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    anxiety.  Others will experience him as moody, petulant,

2    or overly anxious.  He has few outlet for expressing

3    intense emotions and he's not -- and was deemed not adept

4    at handling them without the use of drugs and alcohol.

5    Mr. Kalman expects to have negative experiences with

6    others.  At first he may appear personable and convey an

7    air of well being.  His efforts to portray himself

8    positively however are easily thwarted and his negative

9    feelings toward others eventually will become obvious to

10   those around him.  He's deeply mistrustful of other

11   people and generally feels cheated and misunderstood in

12   interacting with them.  He resents authority and likes to

13   think of himself as a rebellious individual who has

14   little regard for social convention.  He also believes

15   that he has had fewer opportunities than his peers to

16   make a good life for himself.  The angry and resentful

17   feelings that those situations generate are likely to

18   make him behave in an impulsive manner and further hamper

19   his ability to relate to others.

20            During the course of his hospitalization,

21   his regimen of Zyprexa and Depakote, which he had come

22   with on admission, was gradually discontinued.  And as

23   those things were tapered, his mental status remained

24   stable, and continued to remain stable after a rather

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    long period of not being on any medication.

2                About May or June of '02, a different

3    picture of Mr. Kalman emerged.  He began to engage the

4    treatment team in a one upmanship, questioning the

5    decisions made, minimizing the validity of others made,

6    and not respecting his own boundaries.  He would often

7    cross over onto something else.  For instance, discussing

8    and making sure that we know that we were inappropriate

9    with another patient in discussing his treatment plan.

10   These kind of behaviors were going on for awhile until

11   Mr. Kalman finally stated that he had not been receiving

12   enough treatment regarding his substance use and had

13   filed several papers to make his concerns -- to share his

14   concerns with either the administration or to enlist

15   personalities that are nationally recognized into his own

16   -- on his own behalf.  At some point our administration

17   decided to transfer him to Unit 2.  And from there, he

18   spent about two months.  And according to his -- to the

19   documentation, he was not really cooperative and was

20   therefore transferred through an administrative decision

21   to Unit 4.

22               While on Unit 3 he was given the diagnosis

23   of alcohol dependence, in remission, in a controlled

24   environment; cocaine dependence, in remission, in a

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    controlled environment; other substance-use-induced mood

2    disorder, cocaine and alcohol.  A diagnosis of Antisocial

3    Personality on Axis II.  No diagnosis on Axis III.  The

4    stressors on Axis IV were related to interaction with the

5    legal system.  And his global assessment functioning was

6    50.

7            In assessing his risks, the most

8    significant factor for Mr. Kalman was his diagnosis of

9    alcohol dependence and cocaine dependence in light of his

10   inability to remain substance free outside of a

11   controlled environment, inability to remain substance

12   free even under controlled circumstances, and his lack of

13   any significant period of substance free living.  In

14   addition to that, he showed lack of insight into these

15   problems, which magnify the risk of re-engaging in

16   substance use and behaving in a way that would offend or

17   break the law.

18           We have not found any significant evidence

19   of a mental disorder.  We simply established the

20   diagnosis of substance use disorder compounded with a

21   personality disorder that put him at risk of offending in

22   the community.  Thank you.

23           CHAIRMAN BERGER:  Thank you, doctor.  If

24   you would, just turn that microphone around and state

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    your name for the record.

2               DR. SABITA RATHI:  Okay.  I'll just give a

3    brief update on how Mr. Kalman has been doing on Unit 4.

4               CHAIRMAN BERGER:  And if you could, just

5    give us your name and your position at the hospital.

6               DR. RATHI:  Okay.  Sabita Rathi.  I'm the

7    unit psychiatrist on Unit 4, okay.  I'll just give a

8    brief update on how Mr. Kalman has been doing on Unit 4.

9               Mr. Kalman was transferred from Unit 2 to

10   Unit 4 on 10/15/02.  To date, Mr. Kalman has not been a

11   management or behavioral problem on the unit.  He has

12   adjusted well to the unit.  He has not been in any

13   physical or verbal altercations with any staff or

14   patients.  He has been attending therapeutic and

15   rehabilitative groups.  He has, however, continued to be

16   very focused on legal issues.  He spends most of his time

17   when not in groups, writing about legal issues.

18               In the last cycle of 12 weeks, which ended

19   on December 30th, the patient attended approximately 16

20   hours of activities per week.  He also walks several

21   hours per week.  He attended drug and alcohol education,

22   spiritual awareness, de-stressing groups, as well as

23   several rehabilitative groups.

24               Mr. Kalman missed several drug and alcohol

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1  groups due to having to attend court.  He attended court

2  on the 29th of October, the 12th of November, the 25th of

3  November, 10th December, 16th December, 17th December, as

4  well as the 19th of December.  He also attended math

5  skills, writing for success and writing skills in an

6  attempt to attain his GED by his goal date of June 2003.

7  He is on the waiting list for anger management and NGRI

8  groups.

9          On mental status exam, he's alert,

10  oriented, cooperative.  He shows no signs of psychomotor

11  agitation.  His mood is euthymic.  His affect is full

12  range.  His thought processes are logical and goal

13  directed.  There's no indication of suicidal or homicidal

14  ideation.  There's no perceptual disturbances and no

15  indication of other psychotic symptoms, including

16  paranoia and delusions.

17          On Unit 4 the patient had complained of

18  difficulty falling asleep and had stated that he had had

19  this problem for several years.  He was started on

20  Ambien, which is Zolpidem, a short acting sedative, 10

21  milligrams at night, with good effect.

22          And there's been no change in his

23  diagnosis.  His Axis I remains alcohol dependence, in

24  remission, in controlled environment; cocaine dependence,

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    in remission, in controlled environment; nicotine

2    dependence.  And his Axis II is the Antisocial

3    Personality Disorder.

4                    CHAIRMAN BERGER:  Thank you.  Attorney

5    Conway, do you have any questions for any of the

6    witnesses?

7                    MR. CONWAY:  Just a couple of questions,

8    Mr. Chairman.  First, actually, more of a point of

9    clarification.  Dr. Carre, I believe, said that he's 41

10   years old.  He's actually 31 years old.  Just a point of

11   clarification.  I understand it's --

12                   CHAIRMAN BERGER:  Actually he's 32.

13                   MR. CONWAY:  Thirty-two now -- (laughter)

14   -- but I guess at the time of the report he was 31, I

15   believe.

16                   Dr. Carre, in your treatment of Mr.

17   Kalman, at any point in time did you find him to be of a

18   violent nature?

19                   DR. CARRE:  No --

20                   COURT REPORTER:  Can you take the

21   microphone please.

22                   DR. CARRE:  Sure --

23                   MR. CONWAY:  Sorry --

24                   DR. CARRE:  No --

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1       MR. CONWAY:  Can you hear me?

2       DR. CARRE:  No, I --  I had made it clear

3   that Mr. Kalman has never been violent on the unit.

4       MR. CONWAY:  In fact he was -- he was

5   found by a court, pursuant to statute, that -- to not be

6   so violent so as to require the maximum security setting?

7       DR. CARRE:  Can you say that again please?

8       MR. CONWAY:  Sure.  In fact, to your

9   knowledge, he was found by a court, based on your

10  testimony, to be not so violent so as to require maximum

11  security -- a maximum security setting?

12      DR. CARRE:  Could you add some more

13  clarification --

14      MR. CONWAY:  Sure --

15      DR. CARRE:  -- as to the court decision --

16      MR. CONWAY:  -- no problem.  I'll try --

17  I'll try it again.  Let me just go in a different

18  direction.  Is there any diagnosis pertaining to Mr.

19  Kalman that qualifies as a defense under Connecticut

20  General Statutes 53a-13 that you have discovered?

21      DR. CARRE:  The -- what is -- what is the

22  statute, I'm not too --

23      MR. CONWAY:  It's a law --

24      DR. CARRE:  Yeah.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

12

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1              MR. CONWAY:  -- it's the -- it's the

2      statute concerning the defense of mental disease or

3      defect.

4              DR. CARRE:  Uh-huh.

5              MR. CONWAY:  Are you familiar with the --

6              DR. CARRE:  Yes --

7              MR. CONWAY:  Okay --

8              DR. CARRE:  -- so your question is whether

9      --

10             MR. CONWAY:  Whether or not you've been

11     able to diagnose Mr. Kalman with any disorder or illness

12     that qualifies as a defense to criminal conduct pursuant

13     to that particular statute?

14             DR. CARRE:  No, I -- I have not.

15             MR. CONWAY:  Okay.  Your biggest concern

16     regarding Mr. Kalman is his substance abuse, his alcohol

17     -- his potential for alcohol and cocaine use?

18             DR. CARRE:  No, that's not correct.  The

19     cocaine abuse, the -- or dependence -- the alcohol

20     dependence and the Antisocial Personality Disorder.  You

21     cannot say -- I would -- I would not separate all of

22     these.  They have to be taken as a package.

23             MR. CONWAY:  Okay.  So if I understand you

24     correctly, that if -- if Mr. Kalman were to abuse drugs

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    and/or alcohol --

2                 DR. CARRE:   Um-hmm.

3                 MR. CONWAY:   -- it would cause -- it would

4    be a bad combination with -- combined with the antisocial

5    diagnosis?

6                 DR. CARRE:   Yes, that's right.

7                 MR. CONWAY:   Okay.  So as long as he's in

8    a controlled environment, your feeling is that you have

9    no concerns about his behavior then?

10                DR. CARRE:   He will be safe and the

11   community will be safe, yes.

12                MR. CONWAY:   Okay.  And as far as you

13   know, and maybe you can help me --

14                DR. CARRE:   Um-hmm.

15                MR. CONWAY:   -- is this the only setting -

16   - and when I say is this, I mean is Whiting Forensic the

17   only setting that really qualifies as the best place for

18   Mr. Kalman --

19                DR. CARRE:   Oh, no, no --

20                MR. CONWAY:   -- as a controlled setting?

21                DR. CARRE:   Not really.  We have a step

22   down unit at Dutcher that could conceivably address Mr.

23   Kalman's need.

24                MR. CONWAY:   Okay.  I had a question -- I

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    think, if memory serves me right, at some point in time

2    there may have been a working diagnosis, not from you,

3    doctor --

4              DR. CARRE:  Um-hmm.

5              MR. CONWAY:  -- but maybe a prior

6    psychiatrist, a PTSD, a post-traumatic stress disorder --

7              DR. CARRE:  Um-hmm.

8              MR. CONWAY:  Were you able to rule that

9    out?

10             DR. CARRE:  This was ruled out.  We have

11   found no indication, no clinical evidence of such

12   diagnosis with Mr. Kalman.

13             MR. CONWAY:  The setting that Mr. Kalman

14   is currently in, Whiting Forensic --

15             DR. CARRE:  Um-hmm.

16             MR. CONWAY:  -- on a scale of 1 to 10, 10

17   being the most secure, the most controlled I should say,

18   and 1 being the least, how would you rate Whiting?

19             DR. CARRE:  Whiting is quite -- it's high

20   security, maximum security.

21             MR. CONWAY:  A 9 or a 10 on the scale?

22             DR. CARRE:  A 9 or a 10, yes.

23             MR. CONWAY:  Alright.  All Mr. Kalman's

24   needs are taken care of at Whiting?

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1   and/or alcohol --

2           DR. CARRE:  Um-hmm.

3           MR. CONWAY:   -- it would cause -- it would

4   be a bad combination with -- combined with the antisocial

5   diagnosis?

6           DR. CARRE:  Yes, that's right.

7           MR. CONWAY:  Okay.  So as long as he's in

8   a controlled environment, your feeling is that you have

9   no concerns about his behavior then?

10          DR. CARRE:  He will be safe and the

11  community will be safe, yes.

12          MR. CONWAY:  Okay.  And as far as you

13  know, and maybe you can help me --

14          DR. CARRE:  Um-hmm.

15          MR. CONWAY:   -- is this the only setting -

16  - and when I say is this, I mean is Whiting Forensic the

17  only setting that really qualifies as the best place for

18  Mr. Kalman --

19          DR. CARRE:  Oh, no, no --

20          MR. CONWAY:   -- as a controlled setting?

21          DR. CARRE:  Not really.  We have a step

22  down unit at Dutcher that could conceivably address Mr.

23  Kalman's need.

24          MR. CONWAY:  Okay.  I had a question -- I

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    think, if memory serves me right, at some point in time

2    there may have been a working diagnosis, not from you,

3    doctor --

4              DR. CARRE:  Um-hmm.

5              MR. CONWAY:  -- but maybe a prior

6    psychiatrist, a PTSD, a post-traumatic stress disorder --

7              DR. CARRE:  Um-hmm.

8              MR. CONWAY:  Were you able to rule that

9    out?

10             DR. CARRE:  This was ruled out.  We have

11   found no indication, no clinical evidence of such

12   diagnosis with Mr. Kalman.

13             MR. CONWAY:  The setting that Mr. Kalman

14   is currently in, Whiting Forensic --

15             DR. CARRE:  Um-hmm.

16             MR. CONWAY:  -- on a scale of 1 to 10, 10

17   being the most secure, the most controlled I should say,

18   and 1 being the least, how would you rate Whiting?

19             DR. CARRE:  Whiting is quite -- it's high

20   security, maximum security.

21             MR. CONWAY:  A 9 or a 10 on the scale?

22             DR. CARRE:  A 9 or a 10, yes.

23             MR. CONWAY:  Alright.  All Mr. Kalman's

24   needs are taken care of at Whiting?

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1          DR. CARRE:  At this point, I would say

2     yes.

3          MR. CONWAY:  Okay.  Is it safe to say that

4     because that environment is so controlled, that there

5     aren't very many stressors that are environment induced

6     at Whiting?

7          DR. CARRE:  I wouldn't go so far as saying

8     that Whiting itself is not a stressor.  If you are losing

9     your freedom, I think that's a great stressor.  But at

10    this point, given the context in which Mr. Kalman has

11    been hosted at Whiting, I would say that his needs are

12    met there.

13         MR. CONWAY:  Would that -- the fact that

14    there are no stressors present that would normally be

15    present in his life -- well, first of all, let me ask is

16    that true -- is it safe to say that there are -- except

17    for the loss of liberty --

18         DR. CARRE:  Um-hmm.

19         MR. CONWAY:  -- that for the most part

20    there are no stressors present in his daily life at

21    Whiting that might be present if he was out in the

22    community?  In other words, all stressors have been

23    removed?  His meals are taken care of --

24         DR. CARRE:  Um-hmm.

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1          MR. CONWAY:  -- he has a place to sleep,

2      he doesn't have to worry about rent --

3          DR. CARRE:  Um-hmm.

4          MR. CONWAY:  -- he doesn't have to worry

5      about getting fired from his job, these are the types of

6      things I'm talking about.

7          DR. CARRE:  Oh, I see.

8          MR. CONWAY:  Is that -- is it fair to say

9      that all those stressors have been eliminated --

10         DR. CARRE:  Yes --

11         MR. CONWAY:  -- by Whiting?

12         DR. CARRE:  -- that's right.

13         MR. CONWAY:  Would that at all impact how

14     a person might present if they had a diagnosis of PTSD,

15     would it impact that?

16         DR. CARRE:  I don't think one can

17     accurately make the connection between absence of

18     stressors in any particular place and quiescence of

19     symptoms related to PTSD.  I think that would be a far

20     cry to make that connection and arrive at that

21     conclusion.

22         MR. CONWAY:  Is it -- well, I guess what

23     I'm trying to get at is the removal of these stressors,

24     would it impact the way a person might -- a person with

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1   an illness or a disorder how they might present?  In

2   other words, is stress a catalyst for showing symptoms of

3   any mental disease or defect?  Could it -- could it

4   impact how a person presents?

5               DR. CARRE:  It could precipitate an

6   exacerbation of a preexisting illness.  But I would be

7   very prudent in applying that concept to Mr. Kalman's

8   situation and condition.

9               MR. CONWAY:  Why?

10              DR. CARRE:  Because of the way in the past

11  year we have observed Mr. Kalman.  Mr. Kalman has all the

12  time exhibited a rather calculated thoughtful behavior

13  and has taken such actions even against people working

14  here.  To say that all the stressors were removed and

15  he's been functioning quite well, I think does not

16  reflect the true way of Mr. Kalman's functioning and the

17  true nature of the environment in which he's been

18  functioning.

19              MR. CONWAY:  Is it fair to say, at least

20  at some point in the last year, you felt that Mr. Kalman

21  would be better served in a drug or alcohol

22  rehabilitation facility than at Whiting?

23              DR. CARRE:  With regard to his substance

24  use, I think that a drug and alcohol program could help

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    Mr. Kalman quite a bit.  He has in the past been involved

2    in such programs which did not reinforce or create the

3    necessary formula for him to remain free of drugs,

4    instead he continued -- or he resumed and continued to

5    use drugs and alcohol.  So the application of a program

6    itself doesn't guarantee at a hundred percent that the

7    person is going to endorse a sober living style.

8            You have to recall that Mr. Kalman, even

9    under house arrest with an electronic anklet, did go and

10   engage in such activities as consuming drugs.  So in the

11   one hand you have programs that didn't produce the

12   expected effect, an upgraded sense of control that did

13   not support that kind of sober behavior; therefore

14   removing Mr. Kalman from those places where he would be

15   vulnerable to that kind of behavior, contributed to his

16   current sobriety and to his current functioning.

17           MR. CONWAY:  So just -- that was a -- and

18   no disrespect, Dr. Carre, that was sort of a lengthy

19   answer to my question --

20           DR. CARRE:  Yeah, I know.

21           MR. CONWAY:  -- but -- so --

22           CHAIRMAN BERGER:  Might I ask, counselor,

23   where are you going?

24           MR. CONWAY:  Well, I just -- I just -- I

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

19

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    just wanted to flesh out the fact that at some point in

2    time Dr. Carre felt that an alcohol and drug

3    rehabilitation place was a better -- more suited for Mr.

4    Kalman's need.

5                CHAIRMAN BERGER:  I think from his answer,

6    I got the impression that he feels that might be a viable

7    thing, but not outside the concept of the hospital.

8                MR. CONWAY:  Alright.

9                DR. CARRE:  Yes.

10               MR. CONWAY:  And then -- I think you

11   mentioned that Mr. Kalman exhibited a lack of insight

12   into his diagnosed illness?

13               DR. CARRE:  Yeah.

14               MR. CONWAY:  That's not uncommon with

15   someone with an antisocial personality diagnosis?

16               DR. CARRE:  Actually, that's not unusual

17   with people with a substance abuse diagnosis who tend to

18   minimize the severity of their addiction to the point of

19   denial.

20               Let me add something to it.  The

21   circumstances under which Mr. Kalman was transferred from

22   Unit 2 to -- from Unit 3 to Unit 2 were very clear.  Mr.

23   Kalman had stated that he did not receive enough

24   treatment with regard to his substance use.  No sooner

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    than he arrived to Unit 2, that he was not willing to

2    participate in treatment with regard to his substance

3    use.  I mean we're talking about wavering insight or lack

4    of insight in this -- with these instances.  So, yes, I

5    am saying that he is lacking insight into his condition

6    because of the nature of his diagnosis.

7                     MR. CONWAY:  So then it's -- it's -- it's

8    not unusual then to lack insight --

9                     DR. CARRE:  Well --

10                    MR. CONWAY:  -- based on that diagnosis,

11   is that what you're saying?

12                    DR. CARRE:  Based on a substance use

13   diagnosis, yes, it's not unusual to --

14                    MR. CONWAY:  Oh, with anti -- with

15   Antisocial Personality Disorder that's not unusual?

16                    DR. CARRE:  An antisocial personality

17   disorder has -- as I stated before, the person who is

18   engaged into that kind of behavior experiences no empathy

19   for others, disregards the rules, will be impulsive, will

20   have a bit of a congruent paranoia if you will, because

21   he will engage in activities that have broken the law,

22   therefore he has to look over his shoulders.  So that

23   that doesn't describe somebody without insight.  It

24   describes somebody who deliberately disregards the good

1     social rule --

2                    MR. CONWAY:   Let me interrupt you for a

3     second, doctor --

4                    DR. CARRE:   Yeah.

5                    MR. CONWAY:   -- I just -- and I -- we're

6     running -- I don't want to go too long -- I just -- I'm

7     just looking to -- I just want to know --

8                    DR. CARRE:   Um-hmm.

9                    MR. CONWAY:   -- if you know, is it unusual

10    for -- a person with Antisocial Personality Disorder is

11    it unusual for them to have -- to not have great insight

12    into their illness?   It's a -- I mean I'm not asking for

13    a yes or no, but it sort of begs for a yes or no answer.

14                   DR. CARRE:   Well, I understand that, and -

15    --

16                   MR. CONWAY:   In your experience is it

17    unusual --

18                   DR. CARRE:   To have -- that they have

19    insight?   No, that's not unusual.

20                   MR. CONWAY:   That they don't have insight?

21                   DR. CARRE:   Yeah.

22                   MR. CONWAY:   Okay, thank you.   And then

23    lastly, is it your opinion that Whiting is the only place

24    that can take care of Mr. Kalman's current needs?

HEARING RE: ROBERT KALMAN
JANUARY 10  2003

1              DR. CARRE:  Well, I don't think Whiting is

2       the only place that could take care of Mr. Kalman's

3       needs.

4              MR. CONWAY:  Thank you, Dr. Carre --

5              DR. CARRE:  You're welcome.

6              MR. CONWAY:  -- thank you, Mr. Chairman.

7              CHAIRMAN BERGER:  Any questions,

8       counselor?

9              MS. FILAN:  No questions, Your Honor --

10             CHAIRMAN BERGER:  Any --

11             MS. FILAN:  -- but for the record, my name

12      is Susan Filan, F-i-l-a-n.

13             CHAIRMAN BERGER:  Thank you.  Any

14      questions from the Board?

15             MR. JOHN RYAN:  No.

16             MS. SUSAN BLAIR:  No.

17             CHAIRMAN BERGER:  Doctor, I'd like to read

18      a statement to you --

19             DR. CARRE:  Um-hmm.

20             CHAIRMAN BERGER:  -- from the report.  I

21      think it's of Dr. Peter Zeman --

22             DR. CARRE:  Um-hmm.

23             CHAIRMAN BERGER:  -- who did an evaluation

24      for defense counsel --

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1          DR. CARRE:   Yes.

2          CHAIRMAN BERGER:   -- and ask whether this

3    is something with which you would agree.

4          DR. CARRE:   Um-hmm.

5          CHAIRMAN BERGER:   "Although Mr. Kalman

6    does not present a danger to himself or others within a

7    structured hospital setting, it is very likely were he to

8    be in the community at this time, that he would resume

9    his abuse of alcohol and cocaine and would rapidly become

10   dependent upon both of these substances.   Upon the

11   resumption of alcohol and cocaine use, it is probable

12   that Mr. Kalman would present a danger to himself and

13   others.   I base this opinion upon his past behavior while

14   intoxicated with alcohol and cocaine during which he

15   carried out a number of dangerous actions which placed

16   both himself and others in peril.   Mr. Kalman's

17   demonstrated lack of judgment in the past while

18   intoxicated causes me concern that such behavior would

19   recur should he resume substance abuse.   In my opinion,

20   Mr. Kalman is not ready at this time for return to the

21   community."   Would you agree with Dr. Zeman in that --

22          DR. CARRE:   Yes, I do.   I do, sir.

23          CHAIRMAN BERGER:   And you indicated that

24   you thought that Whiting is not the only place?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1           DR. CARRE:  Um-hmm.

2           CHAIRMAN BERGER:  At the present time do

3      you feel that Mr. Kalman needs to be in Whiting

4      considering the statement of Dr. Zeman?

5           DR. CARRE:  I believe that Mr. Kalman

6      needs to be an inpatient.  Does he need the maximum

7      security at Whiting, I doubt it.  Maybe Dutcher could

8      address that better.

9           CHAIRMAN BERGER:  Thank you.

10          DR. CARRE:  You're welcome.

11          CHAIRMAN BERGER:  I would like to ask the

12     psychiatrist the same question, his current doctor.

13     Doctor, if you would turn the microphone --

14          DR. RATHI:  Sorry.

15          CHAIRMAN BERGER:  Do you feel that Mr.

16     Kalman could be handled at the present time within the

17     structure of Dutcher?

18          DR. RATHI:  Usually when the patients come

19     to the unit, it's -- generally, it's our practice -- I've

20     only been with Mr. Kalman for the last two months on the

21     unit -- and generally it's the practice to observe them

22     for approximately six months before we recommend a

23     transfer to the Board.

24          CHAIRMAN BERGER:  So you're not prepared

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1   at this time to indicate that you feel he can be

2   transferred?

3                    DR. RATHI:  I would say there would be a

4   very good probability, of like within a couple of months,

5   to recommend a transfer, but I've only worked with him

6   for two months, and --

7                    CHAIRMAN BERGER:  So you're looking for

8   some additional time?

9                    DR. RATHI:  Correct.  Three or four --

10  five -- a few months more, yeah.

11                   CHAIRMAN BERGER:  Thank you.

12                   MR. CONWAY:  Mr. Chairman, might I follow

13  up just briefly?

14                   CHAIRMAN BERGER:  Sure.

15                   MR. CONWAY:  Doctor, if I understand you

16  then, and please correct me if I'm wrong, what you're

17  saying is so far from your interaction with Mr. Kalman,

18  his behavior, if you had to make a decision today, and I

19  understand that you're not going to, but you would agree

20  that he would be a good candidate for Dutcher?

21                   DR. RATHI:  Yes, he would be a good

22  candidate for Dutcher, correct.

23                   MR. CONWAY:  And so if he were to maintain

24  his current level of participation and cooperation over

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

1    the next couple of months, you would be in a place where

2    you would be able to come back and make that

3    recommendation --

4                    DR. RATHI:  Absolutely, yes.

5                    MR. CONWAY:  Thank you.

6                    CHAIRMAN BERGER:  Anything further to be

7    brought to the attention of the Board in connection with

8    the hearing on Robert Kalman?  If not, thank you all for

9    attending.  The hearing is adjourned.

10

11                    (Whereupon, the hearing adjourned at 11:19

12    a.m.)

POST REPORTING SERVICE
HAMDEN, CT   (800) 262-4102

27

HEARING RE: ROBERT KALMAN
JANUARY 10, 2003

INDEX OF WITNESSES

PAGE

DR. ALEXANDRE CARRE

Direct Testimony                           3
Examination by Mr. Conway                 10
Examination by Chairman Berger            22

DR. SABITA RATHI

Direct Testimony                           7
Examination by Chairman Berger            24
Examination by Mr. Conway                 25

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

# CERTIFICATE

I, Paul Landman, a Notary Public in and for the State of Connecticut, and President of Post Reporting Service, Inc., do hereby certify that, to the best of my knowledge, the foregoing record is a correct and verbatim transcription of the audio recording made of the proceeding hereinbefore set forth.

I further certify that neither the audio operator nor I are attorney or counsel for, nor directly related to or employed by any of the parties to the action and/or proceeding in which this action is taken; and further, that neither the audio operator nor I are a relative or employee of any attorney or counsel employed by the parties, thereto, or financially interested in any way in the outcome of this action or proceeding.

In witness whereof I have hereunto set my hand and do so attest to the above, this 16th day of January, 2003.

Paul Landman,
President

**Post Reporting Service**
**1-800-262-4102**

<u>CERTIFICATION</u>

I hereby certify that a copy of the forgoing Exhibit E, was mailed in accordance with Rule 5 (b) of the Federal Rules of Civil Procedure on this 4th, day of October 2003 to:

Richard J. Lynch
Assistant Attorney General

Henry A. Salton
Assistant Attorney General

Kerry Anne Colson
Assistant Attorney General

55 Elm Street, P. O. Box 120
Hartford, CT 06141 – 0120

Robert Kalman, Pro se,

10