UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

| | | |
|---|---|---|
| ROBERT KALMAN, | : | PRISONER 2004 JAN -8 P 2: 30 |
| *Pro Se, Plaintiff,* | | |
| V. | : | Civil Action No. 3: 03cp 671 *DISTRICT COURT* |
| | | (DJS) (TPS) *BRIDGEPORT CT* |
| ROBERT BERGER, et al., | : | |
| *Defendants,* | | December 24, 2003 |

## DECLARATION OF BENJAMIN NASH

BENJAMIN NASH declares under penalty of perjury:

1. I am over eighteen years of age and believe in the obligation of an oath. The forgoing statement is based upon my personal knowledge and I make this declaration willingly and executed as my free and voluntary act. I am presently confined to the Whiting Forensic Institute the maximum-security service of Connecticut Valley Hospital (hereinafter Institute). I have been here for 18-years.

2. There is no Law Library at the Institute, the maximum-security service of Connecticut Valley Hospital. I read the Defendants' Response in the above captioned matter dated December 18th, 2003 attached to this declaration as Exhibit A.

3. The Institute has a Patient Library downstairs in the basement but not a Law Library.

4. Attached to this declaration as Exhibit B, is a copy of a Report describing events that had taken place at the Institute that lead to the death of a patient. I was on unit two at the time.

5. Unit two is a place that I will not forget. Patients on unit two have been exposed to an environment created by employees that consists of general practices of verbal abuse and psychological abuse. Including the use of vulgar language, boisterous, disrespectful yelling,

I

practices of open threats to restrict treatment, verbal threats to use seclusion and restraint, disrespectful, demeaning and insulting interactions.

6. It would be proper if the defendants' and the Attorney General would provide us with a independent Advocacy Program that is interested in providing us with representation and services. We could also use a Law Library.

Pursuant to 28 U.S.C., Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

December 24, 2003

Benjamin Nash
Whiting Forensic Institute
70 O'Brien Drive
Middletown. CT 06457
Tel: (860) 346 9408

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROY SASTROM & ROBERT KALMAN | : | |
| *Plaintiffs* | : | |
| | : | PRISONER |
| | : | CIVIL ACTION NO. 3:03 CV 671 |
| | : | (DJS)(TPS) |
| v. | : | |
| | : | |
| ROBERT BERGER, JOHN RYAN, | : | |
| JANET WILLIAMS, SYLVIA CANCELA, | : | |
| SUSAN BLAIR | : | |
| *Defendants* | : | December 18, 2003 |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## MOTION FOR EXTENSION OF TIME TO RESPOND TO DEFENDANTS'
## MOTION TO STAY DISCOVERY

The defendants, Robert Berger, John Ryan, Janet Williams, and Sylvia Cancela, do not object to the plaintiff's Motion for Extension of Time to Respond to Defendant's Motion to Stay Discovery. The defendants are filing this response to clarify the plaintiff's representation in his motion for extension of time that he does not have access to a law library at Whiting Forensic Institute ("Whiting"), a maximum-security mental health facility operated by the Department of Mental Health and Addiction Service to which the plaintiff is confined.

Contrary to the plaintiff assertion, there is a law library at Whiting, which the plaintiff has access to. If the law library at Whiting does not have the information sought by the plaintiff, personnel at Whiting will contact the Middletown Superior Court Law Library, which will provide copies of the requested information generally within 24 hours of receipt of such a request. A review of the plaintiff recently filed "Objection to Defendants Motion for Extension of Time Until Discovery has been

Completed to Respond to Motions for Summary Judgment" indicates that the plaintiff indeed has had access to the law library based on the plethora of legal authority cited in his motion.

DEFENDANTS
ROBERT BERGER
JOHN RYAN
JANET WILLIAMS
SYLVIA CANCELA
SUSAN BLAIR

RICHARD BLUMENTHAL
ATTORNEY GENERAL

Richard J. Lynch
Assistant Attorney General

BY:    Kerry Colson
Kerry A. Colson
Assistant Attorney General
Federal Bar No. 25241
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5210
Fax: (860) 808-5385
Kerry.Colson@po.state.ct.us

# Investigation Report
# On the Death of JB

**State of Connecticut
Office of Protection and Advocacy
for Persons with Disabilities**
James D. McGaughey, Executive Director

Susan Werboff, Program Director
Protection and Advocacy for Individuals with Mental Illness (PAIMI) Program
Anne Broadhurst, Principal Investigator

Information compiled by the
State of Connecticut
Office of Protection and Advocacy for Persons with Disabilities
Protection and Advocacy for Individuals with Mental Illness Program
60B Weston Street
Hartford, Connecticut 06120-1551
860.297.4300 (v) – 860.297.4380 (TTY) – 1.800.842.7303 (V/TTY)



THIS PUBLICATION IS AVAILABLE IN ALTERNATE FORMAT UPON REQUEST

This publication was made possible by funding support from the Center for Mental
Health Services, Substance Abuse and Mental Health Services Administration and
is solely the responsibility of the grantee. It does not represent the official views of
the Center for Mental Health Services, Substance Abuse and Mental Health
Services Administration.

# TABLE OF CONTENTS

Executive Summary ................................................................................................. 1

Introduction ........................................................................................................... 9

Background Information ......................................................................................... 10

Events of April 3, 2002 .......................................................................................... 11

Findings of other Investigating Agencies .............................................................. 23

PAIMI Findings ..................................................................................................... 25

Treatment Issues and Concerns ............................................................................ 29

Recommendations .................................................................................................. 34

# TABLE OF CONTENTS

Executive Summary ................................................................................................... 1

Introduction ............................................................................................................. 9

Background Information .......................................................................................... 10

Events of April 3, 2002 ........................................................................................... 11

Findings of other Investigating Agencies ............................................................... 23

PAIMI Findings ....................................................................................................... 25

Treatment Issues and Concerns ............................................................................. 29

Recommendations ................................................................................................... 34

ascertain the nature and extent of the facility's efforts to respond to this incident and protect other patients from harm.]

OPA's inquiry focused initially on the restraint techniques employed and the apparent failure of procedural safeguards that should have protected JB from harm. But underlying questions began to surface: Why were the signs of JB's physical distress disregarded for so long? How could so many trained health care professionals - doctors and nurses, all working in a hospital setting - have misinterpreted clear evidence of an evolving medical emergency, deferring whatever individual doubts they may have had to an institutional presumption about non-compliant patient behavior?

The picture that ultimately emerges strongly suggests that the fatal events of April 3 were a result of more than procedural failures and faulty medical judgment: subtle, erroneous assumptions and missed cues about JB's identity and needs were also major contributing factors. In fact, evidence from his treatment records indicates that the misinterpretation of his respiratory distress on the day he died was but one example of fundamental and tragic misunderstandings that characterized much of his treatment experience at the hospital.

A narration of the events of April 3, 2002, and details about JB's history and treatment are contained in the main body of OPA's report. The details are important not only to clearly understand the sequence of events that preceded JB's death, but also because they help explain how fundamental misinterpretation of his needs and ill-fitting programmatic responses contributed to the tragic outcome. While it is not possible to do full justice to this important information in a condensed summary, a brief description of the events of April 3 and an outline of OPA's findings and recommendations are listed below:

## BACKGROUND EVENTS ON APRIL 3, 2002

On the day he died, JB awoke to find his "activity sheet" missing from the foot of his bed. For patients at Whiting, the weekly activity sheet represents both a schedule and a record of activities attended. The sheets are turned in to staff at the end of each day for scoring. "Positive points" are awarded for appropriate behaviors, while "response costs" are assessed for negative ones. The sheets are returned to each individual the next morning. Applying a somewhat complicated computational formula to the data reflected on the sheets, patients are assigned to one of five "levels". These, in turn, determine the availability of certain individual privileges.

Unit records indicate that JB was very upset that his activity sheet was missing. He accused staff of taking it, and, throughout the early morning, was loud, argumentative and threatening. In response to his agitation, staff encouraged him to voluntarily enter "quiet time" (unlocked, voluntary seclusion), which he did. He soon emerged from the seclusion room, however, and due to his verbally threatening behavior, was placed into "timeout" (involuntary, locked seclusion) for approximately fifteen minutes. At a "debriefing" meeting held after his release from locked seclusion, his behavior and other possible approaches were discussed with JB. The unit psychiatrist who led the meeting reported that although the discussion produced no resolution, by the end of the meeting JB had calmed down.

2

# EXECUTIVE SUMMARY

On April 3, 2002, "JB", a thirty-nine year old patient at the Whiting Forensic Division of Connecticut Valley Hospital, died while being restrained in handcuffs and leg irons on the floor of a hallway of his treatment unit. Preliminary indications were that he had simply suffered a heart attack while struggling with hospital staff. JB had a lengthy history of psychiatric hospitalizations. He presented many of the classic risk factors for heart disease: he smoked heavily, seldom exercised and, at 346 pounds, was described as "morbidly obese". CPR had been administered and 911 called, but, unfortunately, resuscitative efforts had proven futile.

However, as investigations into the circumstances surrounding his death proceeded, it became apparent that there was more to the story. Witnesses reported that JB had ceased to struggle, and was manifesting signs of acute distress well prior to the time that those in charge recognized and declared a medical emergency. Concerns had been voiced about dilated pupils and lack of response to "sternum rubs", but these were dismissed. As JB lay motionless on the floor, one of the psychiatrists present heard him make a "stertorous" exhalation- a "raspy, gurgling exhalation". "His chest compressed with the exhalation, but he did not inhale." Yet, shortly after making this observation, that psychiatrist departed the scene having neither intervened nor brought this observation to the attention of other doctors present. Ironically, JB's continuing passivity and the strange "snorting" sounds he periodically emitted were interpreted as evidence that he was "faking" and "playing possum". Instead of receiving evaluation and life-saving medical intervention, he remained in shackles while staff searched for smelling salts, and debated where and how he should be moved, and whether and how the restraint should continue. Ultimately, his limp body was rolled onto a blanket and dragged into a restraint room where the supervising psychiatrist insisted that Whiting police officers keep him in handcuffs and leg irons. Following another hallway conference, a large dose of Thorazine was ordered and injected into his buttocks. Only after all this had happened did a proper check of vital signs reveal that JB was pulse-less and not breathing.

As required by law, JB's death was reported to the Chief State Medical Examiner and to a number of oversight and law enforcement agencies including the Office of Protection and Advocacy for Persons with Disabilities (OPA). Acting pursuant to its authority under the federal Protection and Advocacy for Individuals with Mental Illness Act (PAIMI), OPA commenced an investigation. Evidence gathered by other investigating agencies was reviewed, treatment records examined, and witnesses interviewed. **FOOTNOTE: [In keeping with DMHAS policy, CVH staff conducted a "Critical Incident Review" of the circumstances surrounding JB's death. OPA requested copies of all information related to this review, but the request was denied by DMHAS, which indicated that the review was part of a peer review process, and was therefore protected from disclosure under federal PAIMI requirements. OPA disagrees with this determination and has filed an action in Federal District Court to compel disclosure of this and other information OPA needs in order to**

1

2.  Throughout the course of the morning, and prior to the implementation of the restraint procedure in the afternoon, JB was not offered the opportunity to engage in any of the "personal safety preferences" he had identified as preferred ways for dealing with behavioral and/or emotional difficulties – activities such as writing in his diary and drawing.

3.  Nicotine withdrawal undoubtedly contributed both to JB's agitation on April 3, and to his overall problem following unit rules. Indeed, a treatment plan summary (dated 1/16/01) reported that JB's persistent violation of unit rules around cigarettes was his single largest issue. Yet there is no evidence that the effects of withdrawal were taken into consideration, or that his addiction to tobacco was being addressed. (Following its investigation, the Department of Public Health cited CVH for failure to develop a program to address JB's nicotine addiction.)

4.  The level and type of force utilized by hospital staff members during the restraint on April 3 failed to take into account JB's known limitations and the increased medical risk associated with his physical condition. JB's records note that he had gained approximately 100 pounds since his 1998 admission to CVH, and, at 346 pounds, was considered "morbidly obese". He rarely exercised, smoked heavily, perspired noticeably and was frequently out of breath after walking short distances. More significantly, JB had complained of shortness of breath on several occasions – most notably when lying flat on his back during periods of restraint. Because of this the hospital had used a wedge under the mattress to elevate his head on occasions when he was restrained. Yet, on the day he died, he was held down flat on his back, placed in manacles, and maintained in a supine position for approximately 20 minutes.

5.  The unit psychiatrist in charge of supervising the restraint failed to properly monitor JB's physical condition throughout the restraint procedure. Despite expressions of concern by nurses and an EMT-trained agency police officer, the unit psychiatrist made no assessment of JB's status during the approximately 20 minutes he was being restrained. Nor was an assessment performed prior to administration of an intramuscular injection of major tranquilizing medication. Instead, the unit psychiatrist attributed JB's "snoring" exhalations and non-responsiveness to "playing possum." (Despite staff reports that JB would sometime feign sleep to avoid scheduled activities, a review of JB's progress notes covering the three and one-quarter year period he was hospitalized revealed only two entries that allude to this behavior. Neither of those incidents involved restraints, seclusion or physical resistance of any type.)

6.  A psychiatrist responding to the emergency code from another unit heard JB give a "stertorous exhalation, a raspy, gurgling exhalation" and observed "his chest compress with the exhalation, but not inhale." Despite this alarming observation, the psychiatrist left the scene of the incident without ensuring that a formal assessment of JB's respiratory status was completed. He stated that the unit psychiatrist who was supervising the restraint "signaled" to him that "everything was under control."

7.  Despite the fact that a large number of medically trained personnel clustered around JB throughout the application of the restraint procedure, no one present properly monitored

4

The morning's events set the stage for further conflict later in the day. In addition to being upset about the missing activity sheet, JB's records also indicate that he had run out of cigarettes several days earlier, and that he had no money to purchase more. (JB was a heavy smoker who periodically ran out of cigarettes.)    After lunch that day, JB was observed smoking a cigarette outside the unit, in the courtyard. As it was known that he had none of his own, this meant he had "bummed" the cigarette from another resident – a violation of facility rules. He was summoned to another meeting with the unit psychiatrist. This meeting that did not go well. According to the psychiatrist's progress notes, JB, who came directly from the courtyard still wearing his winter jacket, left the meeting "in a huff." Due to his loud and threatening behavior, unit staff was ordered to bring him to locked seclusion. As he was being escorted down the hall to the seclusion room, JB reportedly attempted to strike out at one of the "four or five" staff surrounding him. He was immediately brought to the floor, and a psychiatric code was called. The time was approximately 2:30 PM.

At CVH, a psychiatric code alerts all available clinical staff to respond to a psychiatric emergency. By calling the code, unit staff was signaling that the scope of the emergency was beyond their ability to handle without additional help from outside of the unit. Interviews with hospital staff and statements made to facility police indicate that at least twenty people responded, among them four agency police officers, four nurses, two psychiatrists, the unit medical director (a doctor of internal medicine), and nine Forensic Treatment Specialists. One of the participants – a nurse supervisor from another unit put the number of responders at closer to thirty-five. In fact, so many people became involved in holding JB to the floor, or crowded around him, that many of those who responded could not see who he was, or ascertain what was happening.

OPA/PAIMI's full investigation report describes the events that followed in considerable detail. The investigation findings, summarized below, outline these events and identify factors that contributed to JB's death.

## OPA/PAIMI FINDINGS:

1. On the morning he died, JB's treatment staff missed a significant opportunity to help him build trust in them, and insight into the direction of his own recovery. They focused on confronting his inappropriate behavior rather than engaging him in a discussion about the underlying reason he was agitated. In the weeks prior to his death, JB had begun to participate more and to achieve higher levels of success in the Unit 2 program. The missing activity sheet reflected the positive points he earned by participating. His concern for its whereabouts stood in marked contrast to his long-standing posture of indifference. For most of the time he lived on the unit he had avoided activities and even refused to carry the sheet with him. This expression of concern offered an opportunity to acknowledge what succeeding in the unit's program had come to mean for JB, and, perhaps, to offer concrete, trust-building assistance in looking for or re-constructing the missing sheet. Instead, he was placed in time out and counseled regarding what he needed to do differently when upset.

3

his physical condition, even though significant changes were reported and observed. Although they had concerns that "something was wrong," and that the sounds that JB was emitting were "odd," staff members present deferred to the unit psychiatrist's assessment of the situation and his judgment of JB's behavior.

8. According to interview statements and written reports, staff members present expressed confusion regarding outcome expectations. During the course of the incident, staff disagreed amongst themselves regarding whether they were going to transport JB to the time out room or restraint room, the manner in which they were going to move him, and when to remove the handcuffs and leg irons.

9. Well past the point when JB had ceased to struggle, the unit psychiatrist insisted that JB remain in shackles and receive an IM injection of Thorazine.

10. According to the CVH police department Case Report, two police officers confirmed that a unit nurse had twice informed the unit psychiatrist that JB's pupils were dilated prior to the injection of Thorazine. Yet, no further assessment of JB was either ordered or completed by the unit psychiatrist. According to the unit psychiatrist, the Thorazine was administered because "there was concern that if we tried to remove the cuffs he would strike out, even though he was not responding to us and was flaccid at that time." This rationale for continued use of mechanical restraints, and introduction of chemical restraint stands in clear violation of legal requirements necessary to justify their use.

11. After administration of the Thorazine, it was determined that JB's pupils were fixed and dilated and no pulse could be found. An emergency medical code was called. According to the DPH report, the primary care physician for the Whiting Division of CVH, an internist, who had arrived on the scene after JB had been brought to the time out room, reported that "he did not assess JB when his level of consciousness was questioned because there were many people in the room with JB, including the unit psychiatrist." The internist was the only one present with a flashlight, which he handed to staff to appropriately check JB's pupils.

12. As indicated in the DPH report, current DMHAS policies regarding the use of physical restraints for behavioral management do not identify the role of agency police officers in psychiatric emergencies, including criteria for the initiation of police response, providing assistance to nursing staff, and guidelines for specific interventions or restraints used. Agency police officers are the only DMHAS staff authorized to use handcuffs and leg irons, but their use on JB was a direct result of requests from a unit nurse.

13. Although modifications to the current restraint and seclusion room doorway widths have been proposed, the current doorway widths on the unit did not permit staff members to safely escort JB to the seclusion room in an upright position. This necessitated dragging JB through the doorway in a supine position.

14. Staff members attending to JB did not have immediate access to medical supplies that were necessary to properly monitor JB's physical condition during the restraint procedure and to respond to a life-threatening emergency once a medical code was called. Items not

5

readily available to staff on Unit 2 included ammonia inhalants, which were located on the emergency cart housed on another unit, a flashlight, and an emergency cart equipped with battery-operated equipment, such as a defibrillator and suction machine. (Neither the restraint nor the seclusion rooms are equipped with electrical outlets, which hampered the ability of hospital personnel to effectively utilize the emergency medical equipment that was obtained once the medical code had been called. Staff members had to access an electrical outlet one or two doors down from the time out room in order to plug in the suction machine.)

## TREATMENT ISSUES AND CONCERNS

In addition to the specific findings listed above, the OPA/PAIMI investigation identified several more subtle issues of concern. These include:

1. Failure to adequately consider the potential impact of JB's identified cognitive limitations and limited literacy and math skills on his ability to understand and benefit from the complex behavioral program implemented for him.

2. Failure to consider alternative treatment approaches or seek outside consultation despite strong evidence that, for most of his stay, JB derived little benefit from conventional hospital programming.

3. Failure to adequately review and monitor the effectiveness of the multiple psychotropic medications given to JB, and to consider their potential contribution to the 100 pound weight gain he experienced while hospitalized.

4. Failure to recognize and capitalize' on JB's strongly positive responses to individualized instruction in music.

5. Failure to allow holiday visits by family members by ensuring that they remained eligible to visit subsequent to JB's intra-facility transfer.

6. A global need to study the potential effect of client race on perceptions of dangerousness and patterns of restraint use in human service settings.

## RECOMMENDATIONS

The OPA/PAIMI investigation concludes by making the following recommendations to DMHAS:

1. **Review current policies and procedures regarding the emergency application of physical and chemical restraints in order to ensure that both conform to accepted medical standards and do not place individuals at risk of injury or death. It should be clear that in both physical and chemical restraint situations, their use is authorized for only as long as a critical situation persists; that**

individuals being restrained are continuously monitored by medical professionals who are alert to the potential of a medical emergency and qualified to respond appropriately should one arise; that emergency medications are only administered after a medical assessment of the individual's physical condition occurs; and that genuine attempts are made to de-escalate a situation prior to employing emergency interventions. DMHAS staff should identify individual de-escalation strategies and put this in writing in residents' charts. As individualized de-escalation strategies may be subject to change for individuals who are hospitalized for long periods of time, they should be reviewed on a regular basis to ensure that they are still effective. In addition, the manner and type of physical or chemical restraint administered should take into account any physical or emotional limitations that place individuals at greater risk. Strategies for calming individuals down, identified risk factors, and approved restraint techniques should be included in individual treatment plans.

2.  DMHAS should ensure that agency policies and procedures regarding the emergency application of physical and chemical interventions specifically address the role and responsibility of facility police officers, including conditions for their involvement and regulations for types of interventions used.

3.  DMHAS needs to ensure that medical staff members are adequately prepared to recognize what constitutes a medical emergency and to effectively take charge when such situations occur.

4.  DMHAS should establish a protocol for assigning objective supervision to manage the application of emergency physical and chemical restraint procedures. This protocol should include the designation of a staff person who has not been involved in the development of a particular intervention to act as an objective evaluator of the situation and provide guidance to staff, as needed, in order to ensure that appropriate and safe approaches are followed.

5.  DMHAS should ensure that emergency medical equipment and supplies are readily accessible to hospital personnel and in good working order. DMHAS should also ensure that environmental issues that were problematic during the emergency restraint procedure, such as the narrow doorways leading into the restraint and time out rooms, are effectively remedied.

6.  DMHAS should ensure that the unit psychiatrist be disciplined and/or receive training regarding his failure to promptly and appropriately assess JB's changing medical condition during the application of emergency restraint, and for his failure to adequately assess his medical condition prior to the administration of emergency medication.

7.  DMHAS should establish a protocol to ensure that when unprofessional acts and/or omissions by health care professionals are suspected, they are reported to appropriate licensing agencies for review.

8. DMHAS should ensure that all staff members receive ongoing education in such areas as: alternatives to the use of physical and chemical restraint; how their own attitudes and behaviors shape the responses of others; how to recognize signs and symptoms of physical distress when applying emergency restraint procedures; how to assist individuals in meeting criteria for release from restraint as soon as possible; diversity training, which includes an honest discussion of cultural and racial issues; and how to support themselves for their own responses to the often intense nature of their work.

9. DMHAS should develop a formal mechanism to initiate multi-disciplinary, external review and consultation regarding the treatment of individuals whose behaviors are proving to be particularly challenging despite efforts of clinical staff of a particular facility. Particular attention should be paid to those individuals who do not respond to conventional behavioral therapies and/or chemical interventions.

10. DMHAS should review current policies and procedures associated with outside individuals securing approved visitor status within secured facilities to ensure that visitors are not subjected to unnecessary re-authorization procedures once they have been approved.

# INTRODUCTION

The Office of Protection and Advocacy for Persons with Disabilities (OPA) operates in accordance with State and federal statutory mandates that have been established to protect and advance the civil rights of people with disabilities in Connecticut. In keeping with its federal mandate under the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act of 1986, as amended (Title 42 U.S. Code section 10801 et seq.), OPA has the authority to investigate allegations of abuse and/or neglect of persons with psychiatric disabilities, including the death of such individuals, which occur in psychiatric facilities, or facilities such as prisons or jails. "An Act Concerning Physical Restraint of Persons with Disabilities" (C.G.S. 46a-150 et seq.), which went into effect on October 1, 1999, mandates the commissioner of the State Department of Mental Health and Addiction Services (DMHAS) to report any incidence of serious injury or death of individuals to the director of OPA.

On April 10, 2002 OPA began an investigation into the death of JB, a thirty-nine year old man with a psychiatric disability who died during the application of a four-point restraint at the Whiting Forensic Division of Connecticut Valley Hospital on April 3, 2002. The investigation included interviews with professionals employed at Connecticut Valley Hospital (CVH) who had direct knowledge of the circumstances surrounding the incident, as well as other individuals who were familiar with JB's care and treatment. In addition, an extensive record review was conducted, which included hospital records and police reports obtained by the Protection and Advocacy for Individuals with Mental Illness (PAIMI) unit at OPA following JB's death.

The purpose of the investigation was: 1) to examine the specific events leading up to and surrounding JB's death; 2) to identify any relevant issues and concerns regarding JB's care and treatment during the course of his hospitalization; and 3) to determine whether changes or improvements are needed to safeguard other patients.

Materials reviewed for purposes of this investigation include:

- Clinical records of JB's hospitalization at Connecticut Valley Hospital from his admission on 11/18/98 to his death on 4/3/02

- Whiting Forensic Division of CVH Case Report prepared by Officer Jeffrey Roy, including witness statements and Use of Force Report (Report Date: 4/4/02)

- State of Connecticut Department of Public Safety Division of State Police Investigation Report (Report Date: 4/8/02)

- Description of the Social-Learning Program for Whiting Forensic Division Unit 2 authored by Hilliard G. Foster, Jr., M.S., Ph.D. (Revised 11/1/95)

- Middlesex Hospital Emergency Department Record, Paramedic Report Form and Report of Death Form (Date of Reports: 4/3/02)

- Hunter's Ambulance Service Report (Report Date: 4/3/02)

- State of Connecticut Department of Public Health (DPH), Division of Health Systems Regulation, Substantial Allegation Survey Report (Report Date: 5/19/02)

- Report of the postmortem examination and findings performed by Edward T. McDonough, M.D., Deputy Chief Medical Examiner of the State of Connecticut Office of The Chief Medical Examiner prepared from JB's autopsy (Dated: 6/6/02)

- This Office requested copies of all information relative to the critical incident review completed by CVH staff members following JB's death. In response to this request, DMHAS responded that all information relative to the peer review process was protected, and denied OPA access to these materials.

# BACKGROUND INFORMATION

JB was an African-American man who was born on December 24, 1962 and spent most of his life in Bridgeport, CT. According to hospital records, he was the seventh in a family of ten children. His hospital records indicate that he graduated from high school in Westport, CT. By JB's own statements, and, as reported in his hospital records, he had a great interest in art and music, including playing musical instruments, composing, recording music, ceramics, and painting. Upon admission to CVH in 1998, JB had difficulty identifying his own strengths, however he indicated that religion was important to him, and that he attended many different types of churches.

JB maintained sporadic contact with his family throughout the course of his hospitalization at CVH. According to hospital records, JB was very proud of his family of origin and cultural heritage. He indicated that his drug use as a teenager "went against his family's values and that his siblings were hard workers." He also reported that he had worked briefly at around age twenty, but "moved around a lot and got himself into a lot of difficulty."

According to a psychiatric evaluation completed upon JB's admission to CVH on November 18, 1998, JB's psychiatric history dated back to when he was eighteen years old. Between the age of eighteen and the time of his death, JB had numerous psychiatric hospitalizations and involvement with the criminal justice system. JB had diagnoses of paranoid schizophrenia, polysubstance abuse, antisocial personality disorder, borderline mental retardation, and obesity. Problems related to his social environment, primary support group, housing, economics, and interaction with the legal system were also noted in his hospital records. JB served sentences in correctional institutions for legal charges some of which included burglary, possession of narcotics, assault, sexual assault, and larceny.

JB was admitted to CVH on November 18, 1998 for restoration to competency, as the Superior Court in Bridgeport, CT found him incompetent to stand trial for charges of risk of injury to a minor and public indecency. JB was subsequently civilly committed to CVH on April 1, 1999 and remained there until his death on April 3, 2002. He was transferred to Unit 2 of the Whiting Division of CVH on May 21, 2001, where he was living when he died.

This report begins with a description of the specific events of April 3, 2002. It attempts to identify the sequence of events leading to JB's death and what could have been done differently. The report concludes with recommendations for DMHAS, which are intended to stimulate discussion and critical examination of policies and procedures related to the issues raised in this report in order to reduce the use of life-threatening and harmful interventions and to promote access to meaningful, recovery-based mental health services.

## EVENTS OF APRIL 3, 2002

The following chronology of events and witness statements are taken from investigations completed by this Office, the Whiting Forensic Division of CVH Police Department, the State of Connecticut Department of Public Safety Division of State Police, and the State of Connecticut Department of Public Health Division of Health Systems Regulation.

### *What Happened on the Morning of April 3, 2002*

According to staff members and residents of Whiting Forensic Division Unit 2, JB was "agitated" early in the morning of April 3rd because he discovered that his activity sheet[1] was missing. In an interview with OPA investigators, the resident who was responsible for distributing activity sheets that morning stated that he placed JB's activity sheet on the bottom of his bed because JB was still sleeping and he didn't want to disturb him. Upon getting out of bed a short time later, JB reported to unit staff members that his activity sheet was missing, and they responded that they didn't have it.

According to a "Seclusion/Restraint Part I: Initial Assessment by RN and MD" report, dated 4/3/02, the unit nurse and doctor made the following notations:

JB was loud and argumentative at the beginning of breakfast, staff encouraged quiet time[2] to help de-escalate patient's behavior at 8:10 AM. Patient was irritable and

---

[1] An Activity Sheet or Weekly Schedule of Activities Form allows unit staff to record the daily activities that the individual attended. Depending upon the behavior within those activities or groups, *Positive Points* for positive behaviors or *Response Costs* for negative behaviors are earned. Each individual residing on the unit receives a sheet on which a record of their weekly activities is written. Sheets are turned into unit staff members at the end of the day on a daily basis for scoring. They are returned to individuals the next morning. The number of points accumulated determines the privileges available to individuals at each level of a unit-wide step system. (Social-Learning Program, Hilliard G. Foster, Jr., Ph.D.)

[2] Quiet time is a voluntary treatment strategy designed to assist the patient in maintaining or regaining behavioral control through the reduction of environmental stimuli. The patient is encouraged to distance him/herself from the stressor or conflict until constructive problem solving can be employed to mediate the issue. (CVH Nursing Policy and Procedure 10:4 Seclusion)

verbally threatening when escorted to quiet time. JB walked out of quiet time verbally threatening. Staff placed patient in time out[3] at 8:15 AM, he continued to verbally escalate accusing staff of taking his activity sheet. Patient walked out of time out yelling at staff with a raised hand (pointing his finger in a threatening manner). Patient stated, "I'm going to f___ you up." Patient escorted back into the room and he was placed in locked seclusion[4] at 8:20 AM. JB refused a p.r.n.[5] to help decrease his agitation.

(R.N. Initial Assessment)

Patient went in locked seclusion for threatening behavior. He received his regular morning meds (medication) and refused a p.r.n. He began this morning by complaining about his breakfast, then escalated when he accused staff of stealing his time sheet. At this point he went into voluntary time out. He escalated further when he got out of time out to verbally threaten staff, at which point we locked the room.

(M.D. Initial Assessment)

JB remained in locked seclusion for fifteen minutes. At 8:35 AM, the nurse's note reports that:

> JB was lying quietly on the mattress in the corner of his room. Patient agreed to be appropriate on the unit. Patient stated he would not verbally or physically act-out.

A "Seclusion/Restraint Patient Debriefing"[6] report was completed that same morning at 9:15 AM. According to the written report, JB made the following statements when asked to describe what led up to his being placed in seclusion:

> I was arguing with staff in the dining room. I know staff took my activity sheet and I want it back. Staff kept entering my room trying to wake me up and I know they took my activity sheet because I can't find it. I felt staff was playing games with me.

When asked to comment about "other major changes or stressors in his life, as well as other factors that may have made JB more sensitive or vulnerable to losing control at this time," it was noted that JB had not had any cigarettes for four days. When asked what he could change to more effectively cope with a similar situation in the future, JB reported the following:

---

[3] Time out or seclusion is the involuntary confinement of a patient in a room or an area whether alone or with staff supervision where he/she is physically prevented from leaving. (CVH Nursing Policy and Procedure 10:4 Seclusion)

[4] Locked seclusion is utilized when the RN or MD assessment indicates that the patient's degree of imminent dangerousness to others is great and he/she would be unwilling or unable to remain in an unlocked seclusion room. (CVH Nursing Policy and Procedure 10:4 Seclusion)

[5] Medication which is given as circumstances may require; as necessary.

[6] The patient and staff participate in debriefing about the seclusion episode in order to reduce the recurrent use of seclusion. (CVH Nursing Policy and Procedure 10:4 Seclusion)

12

I'll listen to staff instead of verbally acting-out. I'll watch myself the next time. Next time I'll just get a new activity sheet instead of getting hostile. If staff or peers upset me I'll keep to myself.

In response to what staff could do differently if faced with a similar situation again, staff responded that they could "encourage the patient to act like someone who wants to be discharged."

The unit psychiatrist made the following notation in JB's progress notes, dated 4/3/02:

Patient went in locked seclusion for threatening staff of bodily harm. It began earlier when this patient complained about his breakfast this morning; it escalated into accusing staff of "stealing" his time (activity) sheet. He initially went into voluntary seclusion, which we ended up locking when he got out to verbally threaten staff.

A Treatment Plan review was conducted to discuss issues related to the morning's incident and to determine if changes in JB's Treatment Plan[7] were required. The following issues were discussed with JB during the Treatment Plan review:

- Withdrawal from cigarettes due to (his) lack of money
- Lack of responsibility for his behavior
- Poor problem solving
- Difficulty achieving his goals
- Difficulty staying focused on his behavior

According to the unit psychiatrist's notation, there were no changes indicated in the Treatment Plan, as the (overall) use of seclusion and restraint (with JB) had substantially decreased and a plan addressing its use, as necessary, was already in place.

In an interview with OPA investigators, the unit psychiatrist reported that, although "there was no resolution reached, JB had calmed down by the end of the discussion." The unit director, who was also present for the Treatment Plan review, reported that he had suggested to JB that he might have handled the situation differently by asking, "Can I have another activity sheet please?" According to the unit director, JB responded by saying, "You're too intelligent."

Two of five residents interviewed by OPA investigators stated that several staff members on the on the unit "complained because they (staff) thought that JB should have had more

---

[7] JB's Treatment Plan called for staff to tell him, "you are a smooth operator, you should…" (what behavior staff wanted to see, not what they saw). JB received appropriate response costs (the removal of positive points to pay the cost for an inappropriate behavior) and positive points for listening and changing his behavior. Staff members were instructed to tell JB how many positive points he had received and not to discuss response costs. If JB failed to stop the inappropriate behavior or argued with staff, he went to the next step. Staff members were instructed to tell him what he needed to do once. Later they were to tell him what he did right and the positive points he received. If JB argued or walked away from the discussion, staff members were to ask him to go to quiet time for 15 minutes. If JB refused or argued, staff members were instructed to re-assess the situation with the unit psychiatrist.

punishment." According to one of the residents, a staff member present on the morning of the incident said, "JB is lucky that we (staff) can't tie him up – we (staff) used to be able to tie them (residents) up quicker."

Unit staff and residents reported to OPA investigators that JB's missing activity sheet was never found.

### What Happened on the Afternoon of April 3, 2002

1:30 PM Unit 2 O.T. Room and Hallway

At approximately 1:30 PM, the following notation was made in JB's progress notes:

> Patient observed smoking in the courtyard. Patient presently has no cigarettes.[8] Patient asked to return to unit. Patient argumentative saying, "You gotta shut up cracker." Patient told to return to unit, which he did reluctantly. Patient asked to remove his coat and hat to which he replied, "You leave me alone, you ain't my boss." Patient continued, "You motherf___er, you better leave me alone."

The following progress note was made by the Unit 2 psychiatrist and is included as a statement in the Whiting Forensic Division of CVH Case Report (CVH Case Report):

> JB was seen smoking a cigarette in the courtyard by unit staff and asked to return to the unit. On the unit he was giving that staff a hard time so they asked for my assistance. I asked the staff to get JB so that we could discuss his behavior. We had discussed his behavior from last night earlier in a meeting with him and the team and this was to be a repeat of that discussion. He came to the meeting and was tense, angry, refused to discuss the situation and quickly became loud. He said he didn't have to listen to staff. He was angry that he would not be leaving in April[9] (explained to him at the morning meeting) and was unwilling to discuss his behavior. He left the room in a huff before the conversation was complete. As a result staff followed him. I placed him on a one-to-one.[10] He continued to escalate, becoming loud and threatening to staff and I instructed them to get assistance and bring him to locked seclusion. As they were bringing him down the hall, he took a step back and swung at one staff and spit at another. He was surrounded as he was being escorted with maybe four or five staff. They proceeded to bring him to the floor. He continued to struggle. A psychiatric code[11] was sounded.

---

[8] According to Unit 2 Rules and Procedures, under no circumstances are patients allowed to share, trade, barter, or give cigarettes to another patient. Patients found violating this rule may have their smoking privileges restricted, according to their Treatment Plan. (Social-Learning Program, Hilliard G. Foster, Jr., Ph.D.) Unit 2 staff members marked JB's cigarettes with a red line in order to ensure compliance with this rule.

[9] Mr. Bell was due to have a probate hearing in April, at which time the court would decide whether he would continue to remain at Whiting Forensic.

[10] A staff member is assigned to observe the patient at all times.

[11] According to the CVH Operational Procedure Manual, the purpose for calling a code or "all available" is to notify staff of a psychiatric emergency in progress in order that all available clinical staff will respond. A code

14

2:30 PM Unit 2 Hallway

According to all accounts, on April 3, 2002 at approximately 2:30 PM a psychiatric code was called for the Unit 2 hallway.

Interviews with hospital personnel and statements included in the CVH Case Report indicate that approximately twenty individuals responded when the psychiatric code was sounded. Individuals present on the scene included at least four agency police officers, four nurses, two psychiatrists, one internist, and nine Forensic Treatment Specialists (FTS). The officer completing the CVH Case Report reported the following sequence of events, which is corroborated by the testimony of other witnesses:

Upon arrival, I observed patient JB being restrained on the floor on his back. I observed two staff members controlling the legs. I then observed two staff members holding the right arm (holding the wrist and bicep) and two staff holding the left wrist and bicep. One of the staff members holding the left arm was the unit nurse. The unit nurse said, "We need him cuffed." I then told the people holding the right arm that they needed to let go so that I could cuff the wrist. I held the right arm while one of the staff members straddled patient JB, placing one foot on either side of the patient, while he and the unit nurse brought JB's left arm to the center of his chest so I could cuff that wrist.

When I was trying to cuff the right wrist patient JB attempted to curl his arm up. I grabbed his hand and again attempted to cuff his wrist when JB grabbed my hand and tried to crush my fingers. I was then able to place a cuff on the right wrist and tried to bring the cuffed wrist to the center of his chest. He became combative and tried to pull his arm back towards the ground. I pushed his hand to the center of his chest while staff brought his left hand to the center of his chest and JB was finally cuffed in the front of his body. The cuffs were then double locked. I lightly held his arms between his abdomen and chest so he couldn't swing up with his arms. At that time, JB appeared to have normal respiration. He was lying flat on his back, eyes closed, breathing deeply, and exhaling out of his mouth. Staff was then discussing whether they were going to pick him up and carry him or put him on a blanket because of his excessive weight[12] and pull him to the time out room. It was also discussed if they were going to place him in four-point restraint to the bed. I then heard someone say, "JB are you going to get up and walk?" At this time JB still had those deep breaths. The decision was made by staff to put JB on a blanket and pull him to the time out room. At that point, his deep breaths turned into a snore. I gave him a sternum rub[13] in order to solicit response and didn't feel any tension in the chest muscles or receive any response. I looked to the nurse supervisor who was standing to my left and told

---

is called when in the assessment of staff, the scope of the emergency is beyond the ability of the unit staff to handle without assistance from additional staff outside of the unit.

[12] The following was noted on an Annual Nursing Re-assessment completed for JB on 3/11/02: Weight 346, BP 137/90, Pulse 107, Pulmonary: shortness of breath.

[13] A sternum rub is administered by vigorously rubbing the sternum with the second knuckle of the middle finger in an effort to evoke a physical response on the part of a victim during a medical emergency.

15

her that something was wrong. The nurse supervisor then took a pulse from JB's neck and stated that he had a pulse. I gave patient JB another quick sternum rub and there was still no response. They then decided to pull patient JB into the time out room.

According to the Unit 2 psychiatrist:

> JB was maintained on the floor in the hallway. The police handcuffed him and the staff began to pull away. JB lay there initially silent but then when we began to ask him questions, he responded by making snoring sounds. (In an interview with OPA investigators, the Unit 2 psychiatrist reported that he didn't ask JB direct questions requiring a response. Instead, he expected him to respond to statements such as, "JB you need to comply, you need to get up and walk," etc.) He lay still and we needed to decide if he would be picked up and moved to a restraint bed or moved to the seclusion room. He was moved to the seclusion room with the hope that we could talk to him about cooperating. We discussed his current condition and decided that he was playing possum[14], which he had done before. He was breathing and responding with a snoring sound. I checked him for obvious signs of injury once people cleared from around him and saw only a small amount of blood tinge on his front teeth.

The following statement was made by the Unit 2 nurse and is included in the CVH Case Report:

> Patient JB was resistive during the take down process. Patient JB was placed on the floor on his back and continued to struggle with staff. The (Unit 2 psychiatrist) gave a verbal order for a stat.[15] IM[16] Thorazine 100 mg. While patient JB was on the floor he made odd noises, which he had done in the past while staff is trying to redirect him. He then became quiet. I then went to find ammonia ampules[17] to place under JB's nose to determine if patient was faking his non-responsiveness. I then heard the nurse supervisor state that JB had a pulse. The patient then made a few more odd noises as the unit psychiatrist began to talk to JB.

Two nurse supervisors from other units responded to the psychiatric code that was called for JB on Unit 2. The following statement was made by one of the nurse supervisors and is included in the CVH Case Report:

> I responded to the code called on Unit 2. When I arrived on the unit, patient JB had been taken down to the floor and restrained in police leg irons and handcuffs. The

---

[14] While living on Unit 2, there are two progress note entries that allude to this behavior. On 11/23/01, JB pretended to be asleep in a chair in the TV room when medications were being administered and he was being asked to take his medication. On 1/3/02, JB was snoring in a chair in the TV room refusing staff requests to remain awake during the morning routine.

[15] Immediately.

[16] Intramuscular.

[17] A pungent solution which is used to elicit reflex stimulation of respiration and as "smelling salts" to stimulate persons who have fainted.

patient was still, eyes closed. Many staff were surrounding the patient. I observed the patient and did not see his chest rising. I said out loud, "Is he breathing?" I felt for a carotid[18] pulse, had some difficulty, but did feel a pulse. At the same time the officer did a sternum rub with no response. The unit nurse went to get an ammonia inhalant. Staff commented the patient "plays possum." At this point the patient made a loud snorting sound, as if he had been holding his breath. Staff moved him, pulling him on a blanket into the seclusion room.

The second nurse supervisor responding to the psychiatric code provided the following statement, which was included in the CVH Case Report:

When I arrived on Unit 2, I observed that someone was on the floor in the hallway near the dining room. There were a number of staff on top of and around that person and I could not ascertain who it was at first. I had spoken to patient JB about 10 minutes prior and I thought it might be him and asked if it was. Someone responded that it was. I immediately sent (four staff members) back to their units as they were standing around the patient and not needed. I observed the unit nurse at the area of patient JB's head and a Lead Forensic Treatment Specialist (LFTS) holding his legs. A LFTS, FTS, and (another) FTS were holding patient JB's upper body, although I could not see their exact position. I took up a position at patient JB's feet with a FTS and officer assisting. I observed another officer kneeling on the side of the patient in the waist/chest area. The unit psychiatrist was behind me leaning against the wall by the dining room. As I arrived, I also heard a gurgling sound from the patient, which lasted for about 30 seconds. The leg irons were already on the patient. Two officers were attempting to put the handcuffs on the patient and were having difficulty getting his wrists together. I noticed the patient moving, possibly struggling when I arrived, but he stopped moving after the gurgling stopped. Patient JB was cuffed and (the other nurse supervisor) questioned patient JB's breathing. She checked his pulse, stating that he had one and patient JB let out a snort. That was the last sound I heard from him. (One of the officers) gave patient JB two sternum rubs, with no response after each. The unit psychiatrist stated that patient JB was "playing possum" and that he does so all the time. The unit psychiatrist also wanted patient JB moved to the bed and put into restraints. The other nurse supervisor vehemently stated, "No!" and advised the unit psychiatrist that she was not having six people move the patient and get hurt in the process. A strong blanket was obtained and patient JB was rolled onto it to be transported. Five other staff and myself barely lifted the blanket, just enough to slide patient JB into the seclusion room.

(NOTE: In a subsequent interview with OPA investigators, the aforementioned nurse supervisor clarified his statement to include that he did not witness anyone lying on top of JB or exerting pressure on his chest. He indicated that as many as thirty-five staff members may have responded to the code, so there was a large crowd around him.)

---

[18] Pertaining to the right and left common carotid arteries, both of which arise from the aorta, and are the principal blood supply to the head and neck.

A psychiatrist from another unit also responded to the psychiatric code. The following statement was included in the CVH Case Report:

> I got to the code from Unit 2 within 5-10 seconds of the code being announced. When I arrived, I saw a pile of staff on patient JB. There were so many people on top of him, from his head to his toes, that I couldn't even see patient JB. It appeared as though someone was laying across patient JB's chest and someone else was on top of that person. By the time (an officer) came and handcuffed patient JB, people were starting to get off of him. After being cuffed, I observed and heard patient JB give a stertorous[19] exhalation, a raspy, gurgling exhalation. His chest compressed with the exhalation, but he did not inhale. The nurse supervisor said that he was faking it and he was turned on his side. Patient JB was moved to the time out room, per the nurse supervisor's instructions. It was decided that patient JB was to receive a p.r.n. of Thorazine and I left. (The unit psychiatrist) had signaled to me that everything was under control.

(NOTE: In a subsequent interview with this Office, the psychiatrist from another unit amended his statement to include that he did not actually witness anybody lying across JB's chest. He indicated that when he arrived on the scene, he was not able to determine who was underneath what appeared to be a pile of people. According to his statement, "there were so many folks around JB, I couldn't see underneath all of that.")

2:40 PM Unit 2 Time Out/Seclusion Room

According to the officer responsible for completing the CVH Case Report:

> Patient JB was lying on the floor on his back in the time out room. The unit psychiatrist then walked into the time out room and tried some verbal intervention techniques. Patient JB at this time still had that snoring sound. The unit psychiatrist said, "Okay, everyone out of the room." The nurse supervisor then stated to the unit psychiatrist, "If we're going to leave him in time out, take the cuffs off." The unit psychiatrist replied, "No, let's all go out in the hallway and talk about this." All staff exited the room except a nurse supervisor and a couple of other staff that I couldn't identify because they were behind me. The nurse supervisor then stated, "Let's remove the cuff and get his winter jacket off." We then took one cuff off and removed his jacket. At this time patient JB didn't resist. I then re-cuffed patient JB in the front of his chest. At that time unit staff re-entered the room. The unit nurse then opened patient JB's eyes and informed the unit psychiatrist and others that the patient's eyes were dilated.

> The unit psychiatrist then stated that patient JB was to be given an IM injection and then we would take the restraints off. The unit nurse again stated, "His eyes are dilated, you need to check into this."

---

[19] Characterized by a harsh snoring or gasping sound. (Webster's Third International Dictionary)

Another officer present made the following statement, which is included in the CVH Case Report:

> The unit psychiatrist instructed the staff to place the patient in the time out room. Staff complied by placing patient JB on a blanket and dragging him into the room. The unit psychiatrist instructed everyone to leave the room. The staff complied. After staff left the room, the unit psychiatrist began to speak to patient JB. Patient JB responded by making a drawn out snoring sound. The unit psychiatrist said, "Okay JB, you're going to play possum." The patient made another snoring sound, but shorter than the first time. The unit nurse walked into the room and checked patient JB's pupils. The unit nurse told the unit psychiatrist that the patient's eyes were dilated. The unit psychiatrist said something to the unit nurse but I couldn't hear what he said. The unit psychiatrist appeared to dismiss the unit nurse's concerns with the wave of his hand. The unit psychiatrist then said he wanted to leave and talk about this with the nurses. I told the unit psychiatrist that we (police) could not just let the patient stay there with mechanical restraints on him. Another staff member repeated my statement to the unit psychiatrist. The unit psychiatrist said, "They will just have to wait." The unit psychiatrist left the room with the unit nurse. A nurse supervisor entered the room and requested that the handcuffs be removed so that he could take off patient JB's coat. The unit nurse and another police officer entered the room to help nursing staff position the patient on his side to receive an intramuscular injection.

According to a statement made by the unit nurse, which is included in the CVH Case Report:

> I (then) returned (to the time out room) with the ammonia ampules. At this time the patient was lying on his back in the time out room. I then checked his pupils and noticed they were dilated. I then informed the unit psychiatrist and others of my findings. Patient JB was then administered Thorazine100 mg IM because it was believed that the patient was faking.

According to a statement made by the unit psychiatrist, which is include in the CVH Case Report:

> In the (seclusion) room, the snoring sounds got less and there was a change in his (JB's) condition. We gave him Thorazine 100 mg IM at that time because there was concern that if we tried to remove the cuffs he would strike out, even though he was not responding to us and was flaccid at that time. He was unresponsive to the manipulation required to give the IM.

## 2:45-2:50 PM Administration of IM Medication in Time Out/Seclusion Room

According to a statement made by a forensic nurse, which is included in the Case Report:

> When walking down the corridor (of Unit 2) I heard people shouting. I looked over and observed patient JB strike out at a unit 2 staff member and slam him against the

wall outside of the O.T. room. There were approximately three other staff there. A code was called and several people responded including security. The next thing I remember is walking toward the restraint room where everyone was and asked if I could be of assistance. Several people were around the patient at that time so I could not see him. The other nurse on the unit called to me and said the patient needs meds[20]. The unit psychiatrist then came over to me and gave me a verbal order for Thorazine 100 mg IM stat. This was approximately 2:40 PM when I looked at the clock. I drew up the medication and went back over to the room where patient JB was. I hesitated for a few minutes before giving the medication because I was unsure of the patient's status. I believe he was lying on a blanket or mat on the floor of the seclusion room and several staff were there including both nursing supervisors. There was some discussion at that time that the medication would be helpful so that staff could remove the leg irons from security and place the patient in the usual leather ones. The patient was making noises that led staff to believe he was being intentionally uncooperative. JB has in the past demonstrated this behavior by not responding to staff. I again checked with the unit psychiatrist and he told me to go ahead and give the medication. The two nursing supervisors assisted and I gave JB Thorazine 100 mg IM at approximately 2:45-2:50 PM in the right buttocks.

## 2:51 PM - A Medical Code[21] is Called

In a statement included in the CVH Case Report, one of the officers reported the following:

> A nurse supervisor, the unit nurse, and two officers helped roll the patient on his side, while another unit nurse administered two needles. They rolled the patient back onto his backside. The unit nurse checked the patient's eyes again with a flashlight and said to the nurse supervisor, "I'm telling you his eyes are dilated." The nurse supervisor lifted the patient's left eyelid and flinched. I saw the expression on her face and said, "I'm going to call a medical emergency." I then called over the radio that we have a medical emergency on unit 2. Another officer and myself removed the mechanical restraints. CPR[22] was administered on the patient continuously until the paramedics arrived.

According to the unit nurse:

> I checked JB's pupils again and they remained dilated. (In a statement included in the CVH Case Report, the nurse supervisor responsible for taking JB's pulse in the seclusion room indicated that the unit nurse reported that JB's pupils were dilated and fixed.) I then informed the unit psychiatrist and others that something was wrong and that they needed to investigate this further. The nurse supervisor then took patient JB's pulse and no pulse was found. CPR was then started and a medical emergency

---

[20] Medication

[21] According to the CVH Nursing Policy and Procedure Manual, staff physicians and nurses respond to all medical emergencies, as available.

[22] Cardiopulmonary resuscitation