was called. At this time I don't recall who started CPR. I then ran to Unit 3 to get the emergency cart.[23] When I returned with the cart I assisted with CPR.

In a statement to OPA investigators, an internist, who is the primary care physician for the Whiting Forensic Division of CVH, reported that he arrived on Unit 2 just as JB was receiving the IM injection of Thorazine. The internist stated that staff members present in the seclusion room were looking for a flashlight to check JB's pupils and he gave his flashlight to the unit nurse. In a statement included in the DPH Survey Report, the internist stated that he did not assess JB himself when his level of consciousness was questioned because "there were so many people in the seclusion room with the patient, including the psychiatrist."

In a statement included in the CVH Case Report, the unit psychiatrist reported the following:

> Following the IM the nurse suggested we use smelling salts to arouse him from playing possum with us. He did not respond to this. The nurse supervisor was at his head and thought he was not breathing right. The unit nurse checked his pupils and they were sluggish. I checked and found the same thing. He was not breathing at that point and a medical code was started. CPR was initiated immediately and the ambulance was called. An Ambu bag[24] with oxygen was used. We had considerable difficulty maintaining an airway, and I stayed at his lungs with a stethoscope to make sure air was being delivered.

In a statement to State Police investigators, the unit psychiatrist reported that following the IM injection of Thorazine, JB's "respirations were slow but regular." He stated that there was no response to the ammonia salts, and that he "checked JB's pupils with a penlight and that the pupils were dilated but reactive to light." The unit psychiatrist also reported that JB "no longer responded to questions and he stopped breathing." The unit psychiatrist told State Police investigators that "he believes he watched JB stop breathing."

(NOTE: In subsequent interviews with OPA investigators, the unit nurse and one of the nurse supervisors present confirmed that the unit psychiatrist checked JB's pupils after a medical code had been called. However, the unit nurse and two nurse supervisors present indicated that they believed JB's pupils were reported to be fully dilated and fixed when checked with a flashlight by the unit nurse following the IM injection of Thorazine and prior to being checked by the unit psychiatrist. The unit nurse was not able to recall JB's pupils being sluggish or reactive to light.)

The psychiatrist from another unit who had responded to the psychiatric code and left the unit came back to Unit 2 when the medical code was called. According to a statement included in the CVH Case Report:

---

[23] According to hospital personnel, emergency carts, or "crash carts" are located on Units 1, 3, 6, and the lower gymnasium. Emergency carts contain: a cardiac board, trash bag, 25 foot electrical cord, oxygen tank with regulator, gloves, nasal and non-re-breather masks, resuscitation mask, suction machine, suction catheters, Sharps disposal unit, Ambu bag, airways, folder of paperwork, suction handles, ammonia inhalants, aspirin tablets, and various other emergency medications.

[24] Proprietary name for a bag used to assist in providing artificial ventilation of the lungs.

21

A short time later, a medical emergency was announced and I responded. CPR had been started by the unit psychiatrist who was doing chest compressions and the unit nurse who was doing ventilation. I observed that patient JB's nail beds were blue and that his tongue was black.

Another nurse supervisor present in the seclusion room when the medical code was called reported to OPA investigators that neither the restraint nor the time out rooms on Unit 2 are equipped with electrical outlets. As a result, staff members had to access an electrical outlet one or two doors down from the time out room in order to plug in the machine used for suctioning[25] JB.

2:59 - 3:00 PM – Ambulance and Paramedic from Middlesex Hospital Arrive on Unit 2

According to records obtained from Middlesex Hospital, the emergency room physician completed the following report:

At the time of the paramedic's arrival on Unit 2, JB was asystolic[26] and apneic[27] with CPR in progress. There was a moderate amount of emesis[28] around the face. Intubation[29] was difficult but performed successfully. Intravenous[30] access was initially not able to be obtained and so initial resuscitation medications were given down the tube.[31] JB received at least 3 mg of Atropine[32] and 5 mg of Epinephrine.[33] Intravenous was obtained and JB was transported with full ACL[34] to this hospital. There was no significant response to pre-hospital interventions. Initially JB was asystolic. Eventually there were some pre-terminal complexes with no pulses obtained. CPR was continued. JB arrived here totally unresponsive. His pupils were fixed and dilated. Endotracheal tube was in good position. He did have a few scattered agonal[35] beats noted on the monitor, but there was no blood pressure. While I was gathering more information, a milligram of Epinephrine was given. The only response was that his agonal rhythm deteriorated to asystole. At this point the

---

[25] Clearing the airways of mucus, pus, or aspirated materials to improve oxygenation and ventilation.
[26] Cardiac standstill; absence of contractions of the heart.
[27] Cessation of breathing
[28] Vomit.
[29] The insertion of a tube into any hollow organ. Intubation of the trachea provides an open airway and is an essential step in advanced life support. It also permits the instillation of certain critical care drugs, such as lidocaine, epinephrine, and atropine, which the lungs can absorb directly when other forms of internal access are unavailable.
[30] Within or into a vein.
[31] In an interview with OPA investigators, the primary care physician for the Whiting Forensic Division of CVH reported that the hospital is not equipped to administer intravenous procedures and patients must be transferred to medical facilities off-grounds for this purpose.
[32] Medication used primarily to treat potentially life-threatening low pulse rates and heart blocks.
[33] An agent used in advanced cardiac life support, it is helpful in treating cardiac standstill, irregularity or loss of heart rhythm, and other forms of cardiac arrest.
[34] Advanced Cardiac Life Support.
[35] Related to death and dying.

22

paramedic made it clear that the patient had been documented full arrest for at least 30 minutes, probably longer than that based on the history from the Connecticut Valley Hospital staff member and given that there was no real response to any intervention, and there was no evidence of any neurologic activity, the patient was pronounced (dead) by this physician at 15:40 (3:40 PM).

The emergency room physician contacted JB's father, who reported that he had spoken with JB on the phone the previous night. According to the physician's note, JB's father stated that JB was in "good humor" and had no medical complaints.

# FINDINGS OF OTHER INVESTIGATING AGENCIES

Whiting Forensic Division Police Department Findings

The Whiting Forensic Division of CVH Police Department completed a Case Report and Use of Force Report. The Case Report includes statements obtained from individuals having direct knowledge of the incident, many of which are included in the body of this report. The Use of Force Report details how the handcuffs and leg irons were applied to restrain JB and includes a description of his resistance. Given the circumstances described in the Use of Force Report, the CVH administrative officer reviewed and agreed with the force used in this incident. Due to the serious nature and outcome of the incident, the case was immediately turned over to the State Police Major Crime Squad for investigation.

State of Connecticut Department of Public Safety Division of State Police Findings

The State of Connecticut Department of Public Safety Division of State Police completed an investigation, which was received by this Office on July 17, 2002. The investigation report includes statements obtained from individuals having direct knowledge of the incident. State police investigators also spoke with JB's family members, the Medical Director of Whiting Forensic Division, and JB's former social worker.

The investigation report concluded that:

> Information received through statements and reports from those involved with the activities with JB used proper procedures to control him on the floor. There is no information to indicate that anyone used excessive pressure on his chest or stomach areas to cause him to stop breathing. Once personnel noticed his pupils were dilated and he stopped breathing, they executed the necessary activities to start CPR and called for an ambulance to transport him to the hospital. Interviews were conducted with the personnel involved as observers and or participants with the activities with JB. No witness gave information that would contradict any other witness reports and all appeared to conduct themselves within department policy. The evidence items seized did not help with determining the cause of JB's death.

The investigation into this death did not find that the methods employed by Whiting Staff and Police were involved with the death of JB.

Department of Public Health Findings

The State of Connecticut Department of Public Health, Division of Health Systems Regulation, conducted an investigation into the circumstances surrounding JB's death at the request of the Regional Office of the Centers for Medicare and Medicaid Services (CMS) which was received by this Office on June 3, 2002. The purpose of their investigation was to determine whether the facility was deficient in providing appropriate care and services at the time of JB's death, as determined by regulatory program requirements.

According to their Survey Report, the DPH investigation included a review of JB's medical records, interviews with facility personnel, review of facility policies and procedures, review of reportable event documentation, tour of the facility, review of personnel files, and a review of Police Department policies, job descriptions, and restraint statistics.

As a result of their investigation, it was determined that a number of program requirements were out of compliance or not met at the time of JB's death. The deficiencies cited by DPH investigators included the following:

1. The facility failed to ensure that medical staff were responsible for the quality of care provided to all patients.

2. The facility failed to ensure that one patient (JB) was promptly assessed by a physician when a change in the patient's condition occurred during the application of restraints.

3. The facility failed to ensure that use of a chemical restraint was employed only in an emergency situation to ensure the patient's physical safety and that less restrictive interventions were determined to be ineffective.

4. The facility failed to ensure that policies and procedures governing the initiation of restraints to manage violent and aggressive behaviors included provisions and guidelines that addressed the role of facility police officers in the application of restraints.

5. The facility failed to ensure that a comprehensive treatment plan was completed that addressed the patient's ongoing nicotine addiction.

As a result of the DPH investigation, CVH was required to submit a plan of correction, summarizing how each of the deficiencies cited in the Survey Report would be addressed. Referrals were also made to the Practitioners Unit of DPH for action against the medical professionals involved in the incident, as deemed necessary. In addition, the Regional Office of the Centers for Medicare and Medicaid Services will be requesting the DPH to complete a full survey of the Whiting Forensic facilities.

Office of the Chief Medical Examiner Postmortem Report

This Office received the report of the postmortem examination performed by Edward T. McDonough, M.D., Deputy Chief Medical examiner, on June 19, 2002. The report concluded the following:

> No. specific single clinical/historical, anatomic or toxicologic cause of death is elucidated. Reconstruction of the pathophysiologic mechanisms of this death would be multifactorial including his underlying and acutely worsening psychosis, enlargement of his heart, the adrenaline inducing altercation between the deceased and staff, and elevated blood concentrations of clomipramine and quetiapine. He suddenly had a cardiorespiratory arrest that may have occurred at the end of the restraint, or shortly thereafter. There is no evidence of restraint asphyxia, involving either compression of the thorax or neck.

| | |
|---|---|
| Final Cause of Death: | Cardiorespiratory arrest of undetermined etiology associated with multi-person restraint during an acute psychotic episode. |
| Other Significant Conditions: | Cardiomegaly (enlarged heart) |
| | Obesity |
| Final Manner of Death: | Undetermined |

CVH Critical Incident Review

On April 12, 2002, pursuant to our federal authority under PAIMI 42 CFR 51.41, "Access to Records, Facilities and Records," this Office requested copies of all information relative to the critical incident review completed by CVH staff members following the death of JB. In response to this request, DMHAS responded that all information relative to the peer review process was protected, and denied OPA access to these materials. The Office of Protection and Advocacy requires copies of the completed CVH critical incident review documentation in order to fulfill our federal mandate to investigate allegations of abuse/neglect of persons with psychiatric disabilities. OPA has filed a federal lawsuit against DMHAS to obtain information relative to the peer review process and recommendations.

# PAIMI FINDINGS

In addition to the findings reached by the Office of the Chief Medical Examiner, State Police investigators, and the Department of Public Health, and based upon a review of all the available medical and investigative materials, PAIMI also concludes the following:

1. When JB became upset over his missing activity sheet there is no indication from staff that anyone on staff offered to help him find it or assisted him in filling out a new one. Staff, when interviewed, seemed to dismiss the significance of this event and JB's response to it. A morning treatment team meeting convened with JB did nothing further to resolve this incident or to de-escalate JB's concerns. One of JB's treatment objectives

was for him to achieve and maintain a step level 5 in the Social Learning Program. JB's records reveal that for the first six months he lived on Unit 2, his step level remained at zero. According to all reports, he was not regularly participating in programming and his motivational level was low. His most recent psychiatric review notes, "JB found meeting the expectations of the point system difficult because he set his goal at achieving only the maximum amount (of points) and was unwilling to look at lesser goals. He chose to deal with this by not carrying an activity sheet." Just prior to April 3rd, there had been a slight increase in JB's step level. On January 27, 2002 he achieved a step level 2, by February 24, 2002 he had achieved a step level 5, and from March 3rd until March 23, 2002, he had maintained a step level 4. JB's fervent response to his missing activity sheet did not conform to the behavioral standards outlined in his treatment plan. However, the fact that he cared so much about its being missing seems significant and may have represented an opportunity for staff members to engage him in treatment.

2. Throughout the course of the morning, and prior to the implementation of the restraint procedure in the afternoon, JB was not offered the opportunity to engage in any personal safety preferences. As part of the CVH Nursing Admission and Transfer Assessments, patients are routinely asked to identify personal safety preferences that will help them when they are not feeling well or are experiencing behavioral and/or emotional difficulties. JB's personal preferences included such activities as writing in a diary, having something to eat or drink, drawing, or talking with staff.

3. No one seemed to take into account how JB's nicotine addiction and symptoms of withdrawal affected his behavior, although his treatment plan summary (1/16/02) reports that his violation of unit rules around cigarettes represented his single largest issue. Prior to being restrained, JB broke a unit rule by "bumming" a cigarette from another resident. According to hospital records, JB had been without cigarettes for at least two full days prior to this incident. JB received $20.00 per month from the hospital's indigent patient fund, which he used to purchase cigarettes. This amount did not always ensure that he had an adequate supply on-hand and contributed to his relying on other residents for cigarettes.

4. The level and type of force utilized by hospital staff members didn't take into account JB's physical limitations, which placed him at increased medical risk. An annual physical examination and routine blood tests completed in October 2001 were within normal limits and showed JB to be in "good health." However, his records note that on March 14, 1999 he complained of having difficulty breathing and thought the cause was all of the medications he had been taking. On April 11, 1999 hospital records note that JB complained of having shortness of breath. On September 6, 2000, after 8 ¼ hours in 4-point restraint, JB complained of being unable to breathe when lying flat on his back. On September 7, 2000, because of his size and weight, and history of being breathless when lying flat, a wedge was used to elevate the mattress when JB was restrained to the bed. On August 13, 2001 hospital records note that JB complained of dizziness after napping on and off in his chair. JB's records also indicate that he experienced frequent indigestion, which was eased by taking Maalox. On October 10, 2001 JB was placed on a low-fat, low-cholesterol diet with Lactaid tablets. His diet was later changed to single portions. JB's records note that he had gained approximately 100 pounds since his 1998

admission to CVH, and was considered "morbidly obese" at 346 pounds. He rarely exercised and smoked heavily when he had access to his own cigarettes. Several of the residents interviewed by OPA investigators reported that JB was frequently out of breath after walking short distances and perspired heavily. Staff members interviewed also reported that JB had many risk factors for cardiac disease. (NOTE: OPA investigators did not find evidence that JB's medication regime had been reviewed to evaluate those medications that may have contributed to his weight gain. Nor did staff when interviewed identify the need to conduct a medication review to address his weight gain and related health difficulties. According to the most recent CVH Physician's Order Sheet, dated 3/27/02, JB was being prescribed Depakote 1000 mg bid, Neurontin 1600 mg @ 8 pm, 800 mg @ 8 am and 800 mg @ 12 noon, Seroquel 300 mg @ 12 noon and 400 mg @ 8 pm, Anafranil 50 mg @ 8 pm, and Ativan (2) with Clonopin (1) mg p.r.n. not to exceed 1/24 hours.)

5. The unit psychiatrist in charge of supervising the restraint failed to properly monitor JB's physical condition throughout the restraint procedure. Shortly after the application of handcuffs and leg irons, a unit nurse questioned whether or not JB was breathing. Other staff members present reported that JB made what sounded like "snoring, snorting, or gurgling sounds and then he was still." According to the DPH report, a unit nurse checked JB's carotid pulse, which was "fast and not strong," but wasn't able to properly assess his condition due to the crowded and chaotic conditions in the hallway. An agency police officer trained in emergency medical response also performed two successive sternum rubs with no response. Despite these observations, the unit psychiatrist made no assessment of JB's status. After being transported to the time out room, the unit psychiatrist in charge of the restraint checked JB for obvious signs of injury and observed a "small amount of blood tinge on his front teeth." It was reported that JB was "breathing and responding with a snoring sound," however the snoring became less and there was a change in JB's condition noted. Several staff members present in the time out room took one of the handcuffs off JB and removed his winter jacket. JB was then re-cuffed in the front of his chest. At this time, he did not resist. Despite these observations, no formal assessment of JB's status was completed. Instead, the unit psychiatrist in charge of the restraint procedure attributed JB's "snoring" exhalations and non-responsiveness to his feigning sleep or "playing possum." (A review of JB's progress notes by OPA investigators covering the period from December 1998 through April 3, 2002 revealed only two progress note entries that allude to this behavior. On November 23, 2001 JB pretended to be asleep in a chair in the TV room when medications were being administered. On January 3, 2002 JB was sleeping and snoring in a chair in the TV room, refusing staff requests to remain awake for the morning routine. Both of these circumstances bear little similarity to the April 3rd incident. In addition, in an interview with OPA investigators, the unit psychiatrist reported that he didn't ask JB direct questions requiring a response. Instead, he expected him to respond to statements such as, "JB you need to comply, you need to get up and walk," etc.)

6. A psychiatrist responding to the emergency code from another unit heard JB give a "stertorous exhalation, a raspy, gurgling exhalation" and observed "his chest compress with the exhalation, but not inhale." Despite this observation of JB's physical condition, the psychiatrist left the scene of the incident without ensuring that a formal assessment of

JB's respiratory status was completed, because the unit psychiatrist in charge of the restraint procedure had "signaled" to him that "everything was under control."

7. Despite the fact that a large number of medically trained personnel clustered around JB throughout the application of the restraint procedure, no one present allowed for the proper monitoring of his physical condition, although significant changes in JB's condition were reported and observed. Despite having concerns that "something was wrong," and that the sounds that JB was emitting were "odd," staff members present deferred to the unit psychiatrist's assessment of the situation and his judgment of JB's behavior.

8. According to interview statements and written reports, staff members present frequently expressed confusion as to what the outcome of the intervention was to be. During the course of the incident, staff disagreed among themselves regarding whether they were going to transport JB to the time out room or restraint room, the manner in which they were going to transport JB to the time out room, and when to remove the handcuffs and leg irons.

9. The unit psychiatrist in charge of the restraint procedure insisted that JB receive an IM injection of Thorazine in the time out room prior to removing the handcuffs and leg irons even though he had long since stopped struggling. According to the CVH Case Report, two police officers confirmed that a unit nurse had twice informed the unit psychiatrist that JB's pupils were dilated prior to the IM injection being given. However, no further assessment of JB was either ordered or completed by the unit psychiatrist. According to the unit psychiatrist, the Thorazine was administered because "there was concern that if we tried to remove the cuffs he would strike out, even though he was not responding to us and was flaccid at that time."

10. JB's pupils were checked again by the unit nurse after the administration of the Thorazine in the time out room. Following a determination that JB's pupils remained dilated and no pulse was found; an emergency medical code was called. According to the DPH report, the primary care physician for the Whiting Division of CVH, an internist, who was present in the time out room at the time reported that "he did not assess JB when his level of consciousness was questioned because there were many people in the room with JB, including the unit psychiatrist." The internist was the only one present with a flashlight, which he handed to staff to appropriately check JB's pupils.

11. As indicated in the DPH report, current DMHAS policies regarding the use of physical restraints for behavioral management do not identify the role of agency police officers in psychiatric emergencies, including criteria for the initiation of police response, providing assistance to nursing staff, and guidelines for specific interventions or restraints used. Agency police officers are the only DMHAS staff authorized to use handcuffs and leg irons.

12. Although modifications to the current restraint and seclusion room doorway widths have been proposed, the current doorway widths did not permit staff members to safely escort JB to the seclusion room in an upright position. According to staff reports, and based

upon direct observation by OPA investigators, the doorways to Unit 2 restraint and seclusion rooms are 32 inches wide. This necessitated pulling JB from the hallway to the seclusion room in a supine position on a blanket, which prolonged the amount of time he spent flat on his back and may have increased his risk of aspiration and diminished his respiratory capacity.

13. Staff members attending to JB did not have immediate access to medical supplies that were necessary to properly monitor JB's physical condition during the restraint procedure and to respond to a life-threatening emergency once a medical code was called. Items not readily available to staff on Unit 2 included ammonia inhalants, which were located on the emergency cart housed on another unit, a flashlight, and an emergency cart equipped with battery-operated equipment, such as a defibrillator and suction machine. (Neither the restraint nor the seclusion rooms are equipped with electrical outlets, which hampered the ability of hospital personnel to effectively utilize the emergency medical equipment available. Staff members had to access an electrical outlet one or two doors down from the time out room in order to plug in the suction machine.)

# TREATMENT ISSUES AND CONCERNS

In addition to examining the specific events leading up to and surrounding JB's death, this investigation sought to look at how well the treatment environment at the Whiting Forensic Division reflected JB's identity and needs.

## *How Was JB Perceived?*

Psychiatric reviews and psychosocial assessments completed over this time period routinely describe JB as non-compliant, unpredictable, sexually inappropriate, aggressive, threatening, loud, intrusive, belligerent, needy, argumentative, disruptive, paranoid, grandiose, hostile, impulsive, intolerant, accusatory, and lacking insight.

According to a neuropsychological assessment dated May 1, 2000, JB had a full-scale IQ of 69. This represented a 20-point drop in JB's intellectual functioning from a previous IQ score of 89 in 1987. Staff interviewed by OPA investigators reported that JB had limited literacy skills, and that basic mathematics was difficult for him.

Barriers to learning consistently identified by staff included JB's cognitive and emotional limitations and lack of motivation. Progress notes indicate that JB frequently asked questions about procedures that were the same throughout the building, approached staff repeatedly regarding the same requests, and would ask the same questions "over and over."

Staff members also reported that, at the age of thirty-nine, JB had an almost "childlike" approach to issues affecting his behavior and the impact of his actions on others. Staff note that he had "difficulty grasping the concept of antecedent behaviors that result in inappropriate behaviors." Hospital records also note that he "perseverated on his desire to

29

leave (the hospital), but has little understanding of the requirements for discharge despite repeated efforts to explain them to him." Throughout his hospitalization at the Whiting Forensic Division, JB continued to assert that he didn't belong there and repeatedly asked to be discharged. His records indicate that he often believed that he did not need to participate in treatment because his transfer to the Whiting Forensic Division was a mistake.

According to hospital records, JB had "ongoing problems with his hygiene and needed frequent reminders to do his laundry, take showers, and change his clothing." Hospital records also note that JB experienced "difficulties" with other residents and did not consistently participate in therapeutic groups or rehabilitative activities.

JB also consistently violated hospital rules around cigarettes. His "drug-seeking behavior around cigarettes" is described as "dominating his behavior" and his "single largest issue" in his last treatment plan review. A psychosocial assessment completed in March 2002 notes that his "drug-seeking behaviors around cigarettes make it unlikely that he will be able to maintain a sober lifestyle when he returns to the community."

It is important to note that JB's treatment records do not include discussion of the extent to which his cognitive and emotional limitations may have impacted his ability to fully negotiate, and derive benefit from, his treatment program. Not only did staff seem to miss the implications of his limitations, there is no evidence that they were able to get beyond them and understand that standard approaches were not going to be useful. Instead, staff frequently assumed that JB's behavior was a function of his manipulating the system rather than something that was related to his cognitive limitations and psychiatric issues. Not only did this perception mean that alternative approaches weren't attempted or enhanced, it also may have set the stage for expectations that contributed to hospital staff misunderstanding his behavior at the time of his death.

### _What Was Done to Help Him?_

Treatment priorities identified during JB's hospitalization included the following:

> Helping JB to understand the charges which were brought against him and resulted in his admission, increasing his insight into his mental illness and the need for continued medication, increasing his knowledge regarding the risks and health problems associated with obesity, increasing his insight and knowledge of his substance abuse problems, helping him to behave in a manner necessary for maintaining a quality of life in the community and to demonstrate sufficient control over his behaviors to show the community that he will be able to maintain himself in that setting.
> (Treatment/Management Plans 12/98-5/30/01)

Approaches used to meet these goals included participation in behavior management programs, attendance at various educational, therapeutic, health and fitness groups, participation in leisure activities, attendance at treatment team meetings, individual meetings with clinical staff and forensic treatment specialists, compliance with medication regimes, and coordination of discharge plans with a community-based social worker.

*Was JB's Treatment Experience Successful?*

1.  JB's records reveal that minimal (if any) progress was made toward his recovery during the course of his hospitalization.   Despite participation in behavioral management programs, in combination with medication therapies and various physical intervention and time out strategies, a progress note entry dated less than two months prior to JB's death reports that he "remains essentially the same."

    Hospital records throughout this time period consistently report that JB had difficulty following unit rules and regulations, that he was often loud and argumentative, that he refused to take responsibility for his behavior and often blamed others, that he refused to regularly participate in groups and to meet with his Primary Nurse Clinician, that he believed his transfer to the Whiting Forensic Division was a mistake, that he showed little understanding of his mental illness, and that he did not meet treatment objectives regarding his substance abuse.

    Treatment staff consistently describe JB's behavior as unchanging, despite their interventions.  As JB's failure to meet his treatment goals became more chronic and pronounced, treatment approaches remained the same.  His treatment records do not reflect any consideration of the possibility that he couldn't achieve program goals, that they were too much for him.  Neither is there any acknowledgment that his treatment team ever came together and said, "this man is not benefiting from our current approaches...he can't do it, what can we do differently?"  Rather, it was their unyielding position that JB adhere to elevated goals, and implicit insistence on using the same approaches, that may well have contributed to his apparent lack of motivation and frustration.

    Nowhere is it apparent that any attempts were made to meet JB where he was.  Even when JB's pupils are dilated and he was clearly dying, staff kept looking at his "old" behavior, keeping him in handcuffs and leg irons even though he couldn't move.  The question must be asked: How were staff interpreting JB's behavior at that moment?

2.  As indicated earlier, staff frequently reported that JB had difficulty grasping the concept of antecedent behaviors that result in inappropriate behaviors and believed that staffs' expectations of him regarding the requirements for his discharge were too high.

    Despite these apparent difficulties, the most recent behavioral treatment plan developed for JB identified twenty-four antecedent behaviors that JB was required to modify. Examples of antecedent behaviors targeted are: Hands in lap in public places, raising your voice in an intimidating tone, pointing your finger in a threatening and intimidating manner, staring/glaring in a threatening and intimidating manner, disrupting others, being argumentative, intrusive, insisting that your needs be met immediately, staff shopping, violating unit rules, directing staff, inciting others with your grumbling, blaming others for your behavior, refusing to listen, walking away from staff, refusing to talk, not accepting responsibility for your behavior, exposing your body, flirting with staff, being over-familiar, posturing as if to hit, talking others into violating the rules, taking personal

property of others without contact with the victim, taking personal property from someone with contact of the victim (such as intimidating patients for cigarettes).

As a result of their obligation to intervene whenever JB exhibited antecedent behaviors or infractions of the unit rules, one is left with the impression that staff members were on him every minute.     This dynamic appears like an endless cycle of control and provocation.  Staff members are on JB all the time, and he's always provoking.  In a statement made to a hospital staff member when confronted about his rule-breaking JB said, "everyone else breaks the rules all the time, but they (staff) just pick on me – it's like a broken record – every time I turn around I keep doing something wrong anyway – so why bother?"

3.   The behavior therapy program or Social Learning Program utilized on Unit 2 allows individuals residing on the unit to earn positive points for positive behaviors or response costs for negative behaviors depending upon their behavior during activities and groups, and apart from structured group activities.  At the end of every day, the total points gained or lost are tallied and recorded.  Seven days of behavioral observations are divided by 5 to obtain a "modified mean score."  This score is called a Level of Functional Treatment (LOFT) score.  It determines the step in the unit level system that an individual has achieved as a result of their behavior.  Unit privileges and consideration for transfer to a less secure facility are determined by one's step level or total points.

As indicated previously, JB had limited literacy skills.  Reading and mathematics were very difficult for him and his frustration level was low.  According to educational service providers, JB requested tutoring in basic mathematics "to relieve his paranoia over people taking money from him without his knowledge."  Given the reliance upon numbers to measure one's success, one can only assume that JB's limitations in this area may have affected his ability to fully participate in, and benefit from, the type of behavioral programming being provided.  It seems evident that this particular model was not able to meet JB where he was and to reward what was "right" for him.  Instead, the model required him to live up to a set of institutionalized rules and expectations and seemed to concentrate on what was "wrong."

4.   In contrast to his failure to achieve any of the objectives established in his treatment plan, JB's "soul" jumped out in his sessions with his music teacher.  In her work with JB over a brief period of time in 1999, she consistently describes his behavior during their sessions together as calm, low-keyed, cooperative, courteous, polite, cordial, and appropriate.  She indicated in her educational service notes that his strength was his calm manner and politeness when working 1:1.  She advised that he needed frequent encouragement and praise and would benefit from 1:1 tutoring because he "does not tolerate onlookers, even during keyboarding on a musical instrument."  Although she would have been happy to continue meeting with JB if his treatment team was otherwise unable to secure educational tutoring for him, she was forced to discontinue her services due to schedule conflicts and changes in programming on another unit.  There is no evidence in JB's records that services of this nature were ever resumed or the value of exploring this positive approach was recognized.

32

5. In sessions with his social worker, JB often asked to talk about the Egyptian culture because he believed his ancestors came from Egypt. He would say that he was King Tutankhamen, and that his family had brought him to the hills of North Carolina from his pyramid. During one particular session, JB saw crows flying outside the window and stated that the crows were his grandparents. He said that it was easy for them to go to heaven if they are flying. While his treatment providers may have construed this vision as evidence of his psychosis, one wonders if JB's vision and interest in his ancestors might have been regarded as an opening for healing in a more receptive setting.

6. As his hospitalization progressed, JB's records and interviews with hospital staff reflect a rise in the frustration level of those responsible for his treatment. It is apparent that staff members employed within the Whiting Forensic Division of CVH are engaged in some of the most difficult human service work and that a lot is being asked of them. In response to our inquiries, crisis intervention support and on-going training opportunities are available to staff members as a regular feature of working there. One wonders whether what is being done for staff to provide them with a human place to talk about their feelings and their own reactions to the intensity of their work, to grow from their work, to be mindful, to feel supported, and to maintain and nurture compassion for the people they are there to help is sufficient or fully utilized.

7. This case represents the third investigation conducted by PAIMI in recent years in which a person of African American background has died during the application of a restraint procedure in a psychiatric or correctional facility. While there is no direct evidence to suggest that racism may have played a part in the outcome of events involving JB, in order to be responsible, we have to consider the possibility that unconsciously or unintentionally it may have been a factor for all participants. Preliminary research suggests that biases based on color may influence the way people are approached in custodial settings. Is it possible that staffs' perceptions of JB's resistance could have been influenced by racial stereotypes that are at play in the larger society and that can, without our knowing, exert a powerful influence on our attitudes and behavior?

8. According to written progress notes, on November 15, 2000, while JB was a patient on the Whiting Forensic Division Unit 6, his social worker put through the appropriate paperwork for his father and a brother to attend an upcoming Annual Treatment Plan Review. On November 30, 2000, JB's father and brother attended the review meeting. They were given a schedule of hospital visiting hours, along with the hospital's toll-free number and a flyer for the hospital's family support group. In March 2001, JB's father and another brother came again to meet with JB and his social worker. In May 2001, JB transferred to the Whiting Forensic Division Unit 2. On December 24, 2001, JB's birthday and Christmas Eve, JB's father came to the hospital to visit JB. JB's father was not allowed to visit with JB at that time because "security informed him that he was not approved for the visitor's list." According to the progress note, "JB was not pleased with the news, but he handled the news appropriately." The note continues to state that "JB's father did leave some clothing for him." It is difficult to understand why JB's father, who had already been approved to visit with his son as recently as March 2001, was denied access to a visit with him on his birthday and Christmas Eve that same year.

# RECOMMENDATIONS

1. **Review current policies and procedures regarding the emergency application of physical and chemical restraints in order to ensure that both conform to accepted medical standards and do not place individuals at risk of injury or death. It should be clear that in both physical and chemical restraint situations, their use is authorized for only as long as a critical situation persists; that individuals are continuously monitored by medical professionals who are alert to the potential of a medical emergency and qualified to respond appropriately should one arise; that emergency medications are only administered after a medical assessment of the individual's physical condition occurs; and that genuine attempts are made to de-escalate a situation prior to employing emergency interventions. DMHAS staff should identify individual de-escalation strategies and put this in writing in residents' charts. As individualized de-escalation strategies may be subject to change for individuals who are hospitalized for long periods of time, they should be re-evaluated on a regular basis to ensure that they are still effective. In addition, the manner and type of physical or chemical restraint administered should take into account any physical or emotional limitations, which may place individuals at greater risk. Strategies for calming individuals down, identified risk factors, and approved restraint techniques should be included in individual treatment plans.**

In December 2001 DMHAS revised policies and procedures on Restraints for Behavioral Management (Policies and Procedures 3.17.2 and 10.5). These policies and procedures establish fairly comprehensive requirements regarding when restraint may be utilized, types of restraints approved for use at the Whiting Forensic Division of CVH, medical authorization and face-to-face assessments prior to its use, and a prescribed schedule of medical monitoring for vital signs at 15-minute intervals throughout its duration. While current policies and procedures require medical authorization and an assessment of the individual's condition prior to the use of emergency restraint, they do not provide specific direction regarding requirements for initial assessments and extemporaneous medical monitoring. It should be explicitly stated that medical staff are required to check vital signs prior to administering medication on an emergency basis and at regular intervals of shorter than 15-minutes, as the situation requires. Staff should be trained to specifically monitor adequacy of air exchange and level of consciousness. If an individual has a dark skin color, the nail beds, conjunctivae, and tongue should be checked for adequate circulation. Policy directives should explicitly state that medical staff should be alert to the unresponsiveness of an individual during or immediately following a struggle, as such unresponsive behavior may indicate the need for immediate medical attention.

Both medical and custody staff, as they are called upon to assist during emergency restraint procedures, should be trained in methods of restraint that call for individuals to be seated or placed on their sides as soon as possible after control is achieved. If an individual must be restrained in a supine position, staff should ensure that the individual's head is free to rotate to the side and, when possible, is elevated to minimize the risk of asphyxia and aspiration. Current DMHAS policies and procedures direct that if restraint is used it must be in accordance with the individual's treatment plan. They also specify that de-escalation

34

strategies and pre-existing medical conditions, which might compromise an individual's health and safety during a restraint, are clearly identified at the time of admission or intake. However, the level and type of force used by hospital staff members during the restraint procedure involving JB didn't take into account his physical limitations, which may have placed him at risk. (JB was considered "morbidly obese" at 346 pounds. He rarely exercised and smoked heavily when he had access to his own cigarettes. According to several residents living on his unit, he was frequently out of breath after minimal physical exertion and perspired heavily. He had also complained of having shortness of breath, experienced frequent indigestion, and had been placed on a low-fat, low-cholesterol diet.) In addition, when JB became upset in the morning and in the afternoon of April 3rd prior to the emergency application of restraint, he was not given the opportunity to engage in any self-identified de-escalation strategies.

2. **DMHAS should ensure that agency policies and procedures regarding the emergency application of physical and chemical interventions specifically address the role and responsibility of facility police officers, including conditions for their involvement and regulations for types of interventions used.**

According to current policies and procedures, the practice of utilizing handcuffs and leg irons to restrain JB and transport him from the hallway area into the time out room is permissible at the Whiting Forensic Division of CVH. However, DMHAS policies stipulate that only a physician or a nurse, in a physician's absence, may initiate restraint in an emergency. Although the unit psychiatrist was in attendance during the restraint involving JB, he gave no specific order for the use of locked limb restraints. In interviews with OPA investigators, custody staff reported that when custody and clinical staff respond to a psychiatric code, clinical staff are in charge. In order to avoid problems and confusion with respect to standards of responsibility and practice, the terms of custodial involvement in the application of restraints should be clearly specified in DMHAS "Restraints for Behavioral Management" policy and procedure directives.

3. **DMHAS needs to ensure that medical staff members are adequately prepared to recognize what constitutes a medical emergency and to effectively take charge when such situations occur.**

In addition to emergency medical training, staff members should participate in regularly scheduled disaster planning exercises so that they will be able to identify potential problems in the system and address them proactively. Generally speaking, if there is a lack of clarity regarding who's in charge or what individuals are called upon to do, this will emerge in a drill and can be addressed prior to the event of a real emergency.

4. **DMHAS should establish a protocol for assigning objective supervision to manage the application of emergency physical and chemical restraint procedures. This protocol should include the designation of a staff person who has not been involved in the development of a particular intervention to act as an objective evaluator of the situation and provide guidance to staff, as needed, in order to ensure that appropriate and safe approaches are followed.**

All of the individuals involved in restraining JB were so focused on particular tasks, and his history of non-compliant behavior, that they failed to attribute the physical symptoms he was experiencing as evidence of life-threatening physical distress. They unintentionally allowed their perception of JB as uncooperative, aggressive, willful, and resistant to override the facts at hand. In addition, there was considerable deference paid to the psychiatrist in charge of the restraint procedure, making it difficult for others to speak from what they sensed. It would be useful for a supervisor who is not involved in the initial escalation of events and whose perceptions have not been clouded by their previous involvement with an individual to assume overall direction of the intervention.

5. **DMHAS should ensure that emergency medical equipment and supplies are readily accessible to hospital personnel and in good working order. DMHAS should also ensure that environmental issues that were problematic during the emergency restraint procedure, such as the narrow doorways leading into the restraint and time out rooms, are effectively remedied.**

Prior to the emergency medical code being called, staff members present with JB in the time out room did not have access to medical supplies that were necessary in order to properly assess his medical condition. Items not readily available to nursing staff included ammonia inhalants, which were located on an emergency cart housed on another unit, a flashlight to check JB's pupils, and an accessible emergency cart equipped with a battery-operated suction machine and defibrillator. In addition, because neither the restraint nor the time out rooms on Unit 2 are equipped with electrical outlets, staff members were forced to access an electrical outlet one or two doors down from the time out room in order to plug in the suction machine. As stated earlier, narrow doorway widths made it necessary for staff members to pull JB from the hallway into the time out room in a supine position on a blanket, which prolonged the amount of time he remained flat on his back and may have increased his risk of respiration and diminished his respiratory capacity.

6. **DMHAS should ensure that the unit psychiatrist be disciplined and/or receive training regarding his failure to promptly and appropriately assess JB's changing medical condition during the application of emergency restraint, and for his failure to adequately assess his medical condition prior to the administration of emergency medication.**

It should be abundantly clear to every physician on staff in a DMHAS facility that primary responsibilities of this position include being alert to the potential of a medical emergency, recognizing signs of physical distress, and responding appropriately should the need for emergency medical treatment arise. In addition, all physicians on staff in DMHAS facilities should have knowledge of accepted professional standards with regard to conducting and documenting initial and follow-up assessments and observations of clients during the application of emergency restraint procedures. DMHAS should ensure that the unit psychiatrist participates in continuing medical education in conducting initial and follow-up medical assessments, responding to life-threatening emergencies and appropriate emergency medical response.

36

7. **DMHAS should establish a protocol to ensure that when unprofessional acts and/or omissions by health care professionals are suspected, they are reported to appropriate licensing agencies for review.**

In this case the Connecticut Department of Health, Division of Health Systems Regulation, reviewed the circumstances surrounding the death of JB and made referrals to the Department of Public Health Practitioners Unit "for action as deemed necessary." In the future, DMHAS should be prepared to initiate referrals independently if concerns arise regarding the professional actions of licensed medical personnel and deviations from accepted standards of medical or nursing care are suspected.

8. **DMHAS should ensure that all staff members receive ongoing education in such areas as: alternatives to the use of physical and chemical restraint; how their own attitudes and behaviors shape the responses of others; how to recognize signs and symptoms of physical distress when applying emergency restraint procedures; how to assist individuals in meeting criteria for release from restraint as soon as possible; diversity training, which includes an honest discussion of cultural and racial issues; and how to support themselves for their own responses to the often intense nature of their work.**

9. **DMHAS should develop a formal mechanism to initiate multi-disciplinary, external review and consultation regarding the treatment of individuals whose behaviors are proving to be particularly challenging despite efforts of clinical staff of a particular facility. Particular attention should be paid to those individuals who do not respond to conventional behavioral therapies and/or chemical interventions.**

As indicated earlier in this report, it is clear in JB's case, as noted in his records, that minimal progress was made toward his recovery during the course of his hospitalization. While JB's case notes consistently describe his behavior as unchanging, his treatment plan reviews do not reflect any discussions of substantive alternative courses of treatment. Nor do they consider how his cognitive and emotional limitations may have affected his ability to fully participate in, and derive benefit from, the type of behavioral programming and other therapeutic interventions being provided.

When it became clear that JB could not meet the objectives of the treatment plan clinical staff had in mind, bringing a discussion of his treatment history to objective, outside evaluators for consultation and review, could have created the opportunity for a greater understanding of his needs and an exploration of other treatment approaches. This external consultation and review process could look at alternative, creative ways of approaching treatment. For instance, in the case of JB, he was notably calmed by music, loved ceramics, and was interested in the arts, yet there is no record that these services were ever anything but ancillary therapies.

10. **DMHAS should review current policies and procedures associated with outside individuals securing approved visitor status within secured facilities to ensure that visitors are not subjected to unnecessary re-authorization procedures once they have been approved.**

<u>CERTIFICATION</u>

I hereby certify that a copy of the forgoing <u>Declaration</u> was mailed in accordance with Rule 5 (b) of the Federal Rules of Civil Procedure on this 4th, day of October 2003 to:

Richard J. Lynch
Assistant Attorney General

Henry A. Salton
Assistant Attorney General

Kerry Anne Colson
Assistant Attorney General

55 Elm Street, P. O. Box 120
Hartford, CT 06141 – 0120

Robert Kalman, Pro se,

10